Tyler SCORESBY, M.D., Petitioner,

v.

Catarino SANTILLAN, Individually and As Next Friend of Samuel Santillan, A Minor, Respondent.

No. 09–0497.

Supreme Court of Texas.

Argued Nov. 9, 2010.

Decided July 1, 2011.

Rehearing Denied Sept. 30, 2011.

Eric Rene Reyes, Jason C.N. Smith, Art Brender, Fort Worth, for Catarino Santillan.

Michael Alan Yanof, Philipa Remington, Dallas, for Tyler Scoresby, M.D.

Randy J. Hall, David Leon Pratt II, Fort Worth, for Yadranko Ducic, M.D.

Justice HECHT delivered the opinion of the Court, in which Chief Justice JEFFERSON, Justice MEDINA, Justice GREEN, Justice WILLETT, Justice GUZMAN, and Justice LEHRMANN joined.

■ The Medical Liability Act[1] entitles a defendant to dismissal of a health care liability claim if, within 120 days of the date suit was filed, he is not served with an expert report showing that the claim against him has merit.[2] The trial court's refusal to dismiss is immediately appealable.[3] The Act sets specific requirements for an adequate report[4] and mandates that "an objective good faith effort [be made] to comply" with them,[5] but it also authorizes the trial court to give a plaintiff who meets the 120–day deadline an additional thirty days in which to cure a "deficiency" in the elements of the report.[6] The trial court should err on the side of granting the additional time[7] and must grant it if the deficiencies are curable.[8] The defendant cannot seek review of this ruling[9] or appeal the court's concomitant refusal to dismiss the claim before the thirty-day period has expired.[10]

■ While the Act thus contemplates that a document can be considered an expert report despite its deficiencies, the Act does not suggest that a document utterly devoid of substantive content will qualify as an expert report. Based on the Act's text and stated purposes, we hold that a document qualifies as an expert report if it contains a statement of opinion by an individual with expertise indicating that the claim asserted by the plaintiff against the defendant has merit. An individual's lack of relevant qualifications and an opinion's inadequacies are deficiencies the plaintiff should be given an opportunity to cure if it is possible to do so. This lenient standard avoids the expense and delay of multiple interlocutory appeals and assures a claimant a fair opportunity to demonstrate that his claim is not frivolous. The expert report before us meets this test, and therefore the trial court's order allowing thirty days to cure deficiencies and denying the defendants' motions to dismiss were not appealable. Accordingly, we affirm the court of appeals' judgment dismissing the appeal for want of jurisdiction.[11]

1. Tex. Civ. Prac. & Rem.Code §§ 74.001–.507. All references to the Act are to these provisions.

2. *Id.* § 74.351(b).

3. *Id.* § 51.014(a)(9); *Badiga v. Lopez,* 274 S.W.3d 681, 685 (Tex.2009).

4. Tex. Civ. Prac. & Rem.Code § 74.351(r)(6).

5. *Id.* § 74.351(*l*).

6. *Id.* § 74.351(c).

7. *Samlowski v. Wooten,* 332 S.W.3d 404, 411 (Tex.2011) (plurality op. of Medina, J., joined by Jefferson, C.J., and Hecht, J.) (" '[T]rial courts should err on the side of granting claimants' extensions to show the merits of their claims.' " (quoting *id.* at 416 (Guzman, J., joined by Lehrmann, J., concurring in the judgment))).

8. *Id.* at 411 (plurality op. of Medina, J., joined by Jefferson, C.J., and Hecht, J.); *id.* at 416 (Guzman, J., joined by Lehrmann, J., concurring in the judgment).

9. Tex. Civ. Prac. & Rem.Code § 51.014(a)(9) (no interlocutory appeal); *In re Watkins,* 279 S.W.3d 633, 634 (Tex.2009) (orig.proceeding) (no review by mandamus).

10. *Ogletree v. Matthews,* 262 S.W.3d 316, 321 (Tex.2007).

11. 287 S.W.3d 319 (Tex.App.-Fort Worth 2009).

## I

On behalf of Samuel Santillan, a minor, Catarino Santillan sued Dr. Tyler Scoresby and Dr. Yadranko Ducic, two otolaryngology (ENT) surgeons (collectively, "the Physicians"), alleging that they negligently performed a medial maxillectomy to remove growths from Samuel's sinus cavity. Santillan asserts that an incision made too far into Samuel's brain lacerated a blood vessel and required surgery to stop the bleeding, resulting in brain damage and partial paralysis.

To satisfy the Act's expert report requirement, Santillan timely served the Physicians with a letter from Dr. Charles D. Marable to Santillan's attorney. The letter did not attach Marable's curriculum vitae or describe his credentials or experience other than to state that he is "a Board–Certified neurologist". From having examined Samuel and reviewed his medical records, Marable explained his condition as follows:

The patient was initially seen on 8/3/07. He is now a 17–year–old Latin–American male who was taken to John Peter Smith on 1/17/06 for a preoperative diagnosis of maxillary sinus neoplasm under the care of Dr. Yadro Ducic, M.D., an ENT physician, and another surgeon, Dr. Tyler Scorsby [sic], with procedures of left mediomaxillectomy [sic], excision of neoplasm of the maxilla, calvarial bone growth and reconstruction of maxilla and excision of tumor of pterygopalatin [sic] structures. During the procedure, an incision was made in the right parietal region in a coronal fashion and carried down the pericranium. As a result of this, there was cortical laceration with active bleeding from several medium size vessels in the area.

According to Dr. Scorsby's [sic] note, the patient awoke in the operating room without complications and was taken to the post anesthesia care unit. However, on awakening he did not have a normal neurologic exam, in fact, had a right-sided hemiparesis, and due to the progression of his neurological deficit, increasing intercerebral hemorrhage was noted by CT scanning.

He was taken back to the operating suite on 1/18/06 by Dr. Gregory Smith, D.O., a neurosurgeon. Dr. Smith's preoperative diagnosis was that of expanding inter-cerebral hematoma, status post split thickness skull harvesting, with postoperative diagnosis of expanding intercerebral hematoma and intercerebral hematoma skull perforation. Procedure performed was that of a left parietal craniotomy with evacuation of intercerebral hematoma, repair and hemostasis. Dr. Smith's operative report states there was cortical laceration with active bleeding from several medium-sized vessels in the left parietal area, which were then cauterized with bipolar cautery for hemostatis. An underlying intercerebral hematoma was entered and eventually evacuated successfully with suction.

\* \* \*

It appears he was in the hospital until 2/11/06, and at that time was transferred to HealthSouth Rehabilitation Hospital, Cityview, admitted on 2/11/06, date of discharge 2/21/06. He was discharged with the diagnosis of left parietal hemorrhage, maxillary sinus tumor resection, right hemiparesis, persistent pain, apraxia, seizure prophylaxis, peptic ulcer prophylaxis and right hemisensory deficit. During his stay at HealthSouth Hospital he progressed in all areas of mobilization and self-care. He was ambulating greater than 400′, but still had significant right upper extremity weakness and spasticity. It was then deemed necessary to transfer him to an outpatient brain injury program and work on his strength, cognition and overall mobilization. . . .

He was seen on 8/3/07. He still has weakness of his right arm and leg. Walking seems to still be a problem.... He is still having headaches in the occipital region.

Marable's letter concluded:

As a Board–Certified neurologist, my opinion is that Dr. Ducic violated the standards of care, as well as Dr. Scorsby [sic], and as a result his damages are that of a right-sided hemiparesis with possibility of seizure foci in the future. Although he has not had any seizures, he certainly does meet the criteria for a seizure disorder. Had it not been for Dr. Ducic and Dr. Scorsby's [sic] negligent activity in causing cortical laceration of this patient's left parietal lobe, he would not have needed further hospitalization at John Peter Smith or the ICU therapy, or going to HealthSouth Rehab, and is now left with a right hemiparesis at a young age.

The Physicians each timely objected that the letter was inadequate as an expert report, asserting that: (i) a neurologist is not qualified to testify regarding the standard of care for an ENT surgeon in performing the procedures the Physicians performed on Samuel; (ii) Marable's opinions regarding the Physicians' standard of care, breach, and causal relationship to Samuel's injuries were conclusory and directed to Scoresby and Ducic collectively rather than individually; and (iii) Marable's curriculum vitae was not included, as the Act requires.[12] The Physicians argued Marable's letter was so woefully deficient, it did not even qualify as an expert report under the Act to meet the 120–day deadline. They moved the court to dismiss the case with prejudice and award them their reasonable attorney fees and costs.

After the 120–day deadline, Santillan served the Physicians with Marable's curriculum vitae and his amended report, in which he added that "the applicable standard of care would have been to perform the procedure of a calvaria bone transplant without nicking or lacerating the parietal cortex [and] to get the appropriate surgeon, such as a neurosurgeon, instead of an ENT physician to do a calvaria bone grafting procedure", and that "Dr. Ducic and Dr. Scorsby [sic] ... failed to perform a careful and well-planned surgery, causing a laceration of the cortical hemisphere, causing substantial bleeding". At the hearing on the Physicians' objections and motions, the trial court refused to consider Marable's post-deadline amended report. The Physicians complained that Marable's original letter did not show that he had sufficient qualifications and experience to render an opinion regarding the surgery, and did not define the standard of care, state how it was breached, or explain how a breach resulted in Samuel's injuries. The Physicians acknowledged that Samuel suffered a lacerated artery but argued that such things are inevitable in surgery, no matter how carefully it is performed, and do not necessarily indicate a breach of the standard of care. The trial court denied the motions to dismiss and granted Santillan a thirty-day extension to cure deficiencies in the report.

The Physicians appealed, persisting in their contention that Marable's letter was too inadequate to qualify as an expert report; therefore, Santillan had not met the 120–day deadline; and consequently, the Act did not permit an additional thirty days to cure the deficiencies but instead required that the case be dismissed.[13] The court of appeals construed our analysis in *Ogletree v. Matthews*[14] to mean that defi-

12. Tex. Civ. Prac. & Rem.Code § 74.351(a).

13. 287 S.W.3d at 320.

14. 262 S.W.3d 316.

ciencies in a document tendered as an expert report will not preclude it · from qualifying as such.[15] The court concluded that an interlocutory appeal in these circumstances was not permitted.[16]

We granted the Physicians' petitions for review.[17]

While this appeal has been pending, the Physicians have lodged essentially the same objections to Santillan's amended report as they made to the original report. They have also moved again for dismissal, attorney fees, and costs. The trial court has not ruled on those objections and motions.

## II

The Legislature enacted the Medical Liability and Insurance Improvement Act ("MLIIA") in 1977 [18] in response to "a medical malpractice insurance crisis in the State of Texas" that was having "a material adverse effect on the delivery of medical and health care in Texas, including significant reductions of availability of medical and health care services to the people of Texas and a likelihood of further reductions in the future".[19] The Legislature found that the crisis had been created by an "inordinate[ ]" increase in the volume and expense of health care liability claims.[20] Concerned that "the direct cost of medical care to the patient and public of Texas ha[d] materially increased",[21] the

Legislature's purpose in the MLIIA, expressly stated, was to

> reduce excessive frequency and severity of health care liability claims[,] ... decrease the cost of those claims[,] ... do so in a manner that will not unduly restrict a claimant's rights any more than necessary to deal with the crisis[, and thereby] ... make affordable medical and health care more accessible and available to the citizens of Texas. . . . [22]

In 2003, the Legislature replaced the MLIIA with the Medical Liability Act, repeating its 1977 findings and statements of purpose.[23]

■ Fundamentally, the goal of the MLIIA and the Medical Liability Act has been to make health care in Texas more available and less expensive by reducing the cost of health care liability claims. To that end, both statutes have sought to deter frivolous lawsuits by requiring a claimant early in litigation to produce the opinion of a suitable expert that his claim has merit. "[E]liciting an expert's opinions early in the litigation [is] an obvious place to start in attempting to reduce frivolous lawsuits" [24] and thereby reduce the costs of claims.

The Legislature first added an expert report requirement to the MLIIA in 1993, then strengthened it over the next ten years, finally allowing interlocutory appeals to ensure uniform enforcement. We

15. 287 S.W.3d at 324.

16. *Id.* at 325.

17. 53 Tex.Sup.Ct.J. 1061 (Aug. 27, 2010). We have jurisdiction to determine whether the court of appeals had jurisdiction. *Tex. Dep't of Criminal Justice v. Simons,* 140 S.W.3d 338, 343 (Tex.2004).

18. Act of May 30, 1977, 65th Leg., R.S., ch. 817, 1977 Tex. Gen. Laws 2039, formerly TEX REV.CIV. STAT. ANN. art. 4590i [hereinafter 1977 Act].

19. 1977 Act, § 1.02(a)(5)–(6).

20. 1977 Act, § 1.02(a)(1)–(5).

21. 1977 Act, § 1.02(a)(8).

22. 1977 Act, § 1.02(b)(1)–(3), (5).

23. Act of June 2, 2003, 78th Leg., R.S., ch. 204, §§ 10.01, 10.09, 10.11, 2003 Tex. Gen. Laws 847, 864–882, 884–885.

24. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 877 (Tex.2001).

look first at the requirement, then the appeal, and finally at their proper operation together.

## A

The 1993 amendment to the MLIIA required a plaintiff, within ninety days of filing suit, either to file an affidavit that he had obtained a suitable expert's opinion that his claim had merit or to post a $2,000 bond or cash deposit.[25] The trial court could extend the deadline for up to ninety days "for good cause shown".[26] A plaintiff who failed to comply risked dismissal without prejudice and liability for costs, again, except for "good cause ... shown".[27]

In 1995, the Legislature required that the expert report itself be filed and raised the amount of the bond or deposit posted in lieu of a report to $5,000.[28] The amendment retained the ninety-day initial deadline but added that even if a bond or deposit were posted, an expert report and curriculum vitae must be filed within 180 days of initiating suit.[29] The amendment specified the qualifications the expert was required to have[30] and defined the report as one "provid[ing] a fair summary of the expert's opinions ... regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed."[31] The failure to make "a good faith effort" to comply[32] could result in dismissal with prejudice and liability for attorney fees as well as costs.[33] But if the failure—even missing the deadline completely[34]—was "not intentional or the result of conscious indifference but was the result of an accident or mistake," the trial court was required to grant "a grace period of 30 days to permit the claimant to comply".[35]

The Medical Liability Act, adopted in 2003 and now in effect, eliminates the bond/deposit alternative, shortens the deadline for the expert report and curriculum vitae to 120 days (unless extended by agreement), and requires service rather than filing.[36] The Act retains the definition of an expert report[37] but is more specific about an expert's qualifications.[38]

The Act now distinguishes between missing a deadline altogether and serving an inadequate report. Section 74.351(b) provides that

[i]f, as to a defendant ..., an expert report has not been served [by the deadline], the court, on the motion of the

25. Act of May 25, 1993, 73rd Leg., R.S., ch. 625, § 3, 1993 Tex. Gen. Laws 2347, 2347, formerly TEX.REV.CIV. STAT. ANN. art. 4590i, § 13.01(a)–(b) [hereinafter 1993 Act].

26. 1993 Act, former art. 4590i, § 13.01(d).

27. 1993 Act, former art. 4590i, § 13.01(c).

28. Act of May 5, 1995, 74th Leg., R.S., ch. 140, § 1, 1995 Tex. Gen. Laws 985, 986, formerly TEX.REV.CIV. STAT. ANN. art. 4590i, § 13.01(a) [hereinafter 1995 Act].

29. 1995 Act, former art. 4590i, § 13.01(d).

30. 1995 Act, former art. 4590i, §§ 13.01(r)(5) & 14.01.

31. 1995 Act, former art. 4590i, § 13.01(r)(6).

32. 1995 Act, former art. 4590i, § 13.01(*l* ).

33. 1995 Act, former art. 4590i, § 13.01(e).

34. *Stockton v. Offenbach*, 336 S.W.3d 610, 616 (Tex.2011) ("Under article 4590i, a plaintiff could obtain an extension, even when no report was provided by the deadline, if the plaintiff could show an 'accident or mistake' in failing to furnish a timely report.").

35. 1995 Act, former art. 4590i, § 13.01(g).

36. TEX. CIV. PRAC. & REM.CODE § 74.351(a).

37. *Id.* § 74.351(r)(6).

38. *Id.* §§ 74.351(r)(5), 74.401–.403.

[defendant], shall, subject to Subsection (c), enter an order that:

 (1) awards [the defendant] reasonable attorney's fees and costs of court ...; and

 (2) dismisses the claim with respect to the [defendant] with prejudice to the refiling of the claim.[39]

Under section 74.351(*l*), the same consequences attend serving an inadequate report that "does not represent an objective good faith effort" to comply with the Act's requirements.[40] But before those consequences are imposed, the Act provides an opportunity for deficiencies to be cured. Section 74.351(a) requires that any objection to the sufficiency of a report be lodged within twenty-one days of service,[41] and section 74.351(c) provides:

 If an expert report has not been served [by the deadline] because elements of the report are found deficient, the court may grant one 30–day extension to the claimant in order to cure the deficiency."[42]

 The Act's thirty-day extension to cure deficiencies replaces the 1995 law's thirty-day "grace period" for "accident or mistake", shifting the focus from the claimant's conduct to the report's contents. But the importance of an appropriate delay in finally dismissing a claim for want of an adequate report is undiminished. The

purpose of the expert report requirement is to deter frivolous claims,[43] not to dispose of claims regardless of their merits. "The Legislature has determined that failing to timely file an expert report, or filing a report that does not evidence a good-faith effort to comply with the definition of an expert report, means that the claim is either frivolous, or at best has been brought prematurely."[44] But the Legislature has likewise recognized that when an expert report can be cured in thirty days, the claim is not frivolous. It must be remembered that " '[t]here are constitutional limitations upon the power of courts ... to dismiss an action without affording a party the opportunity for a hearing on the merits of his cause' ",[45] and those limitations constrain the Legislature no less in requiring dismissal.

For these reasons, we have held that trial courts should be lenient in granting thirty-day extensions and must do so if deficiencies in an expert report can be cured within the thirty-day period. This "minimal delay before a report's sufficiency may again be challenged and the case dismissed, if warranted"[46] does not impair the purpose of the Act.

### B

Under the MLIIA, there was no interlocutory appeal from the denial of a motion

---

**39.** *Id.* § 74.351(b).

**40.** *Id.* § 74.351(*l*).

**41.** *Id.* § 74.351(a).

**42.** Tex. Civ. Prac. & Rem.Code § 74.351(c).

**43.** *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 878 (Tex.2001) ("And one purpose of the expert-report requirement is to deter frivolous claims.").

**44.** *Id.*

**45.** *TransAmerican Natural Gas Corp. v. Powell,* 811 S.W.2d 913, 918 (Tex.1991) (quoting *Societe Internationale v. Rogers,* 357 U.S. 197,

209–210, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958), citing *Hammond Packing Co. v. Arkansas,* 212 U.S. 322, 350–351, 29 S.Ct. 370, 53 L.Ed. 530 (1909), and *Hovey v. Elliott,* 167 U.S. 409, 17 S.Ct. 841, 42 L.Ed. 215 (1897); *accord Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 705–706, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982)); *see also Walker v. Gutierrez,* 111 S.W.3d 56, 66 (Tex.2003).

**46.** *Ogletree v. Matthews,* 262 S.W.3d 316, 321 (Tex.2007).

to dismiss a health care liability claim for failure to comply with the expert report requirement, and we did not make clear until 2008 that review by mandamus was available.[47] In adopting the Medical Liability Act in 2003, the Legislature permitted an interlocutory appeal from an order denying "all or part of the relief sought by a motion under Section 74.351(b), except that an appeal may not be taken from an order granting an extension under Section 74.351".[48] In a series of cases, we have explained the limits of this review mechanism.

If an expert report is timely served, even without a curriculum vitae, we held in *Ogletree v. Matthews* that the trial court's denial of a motion to dismiss, asserting the report's inadequacy, cannot be appealed if the court also grants a thirty-day extension to cure deficiencies.[49] "This prohibition," we said, "is both logical and practical." [50] Otherwise,

> the court of appeals would address the report's sufficiency while its deficiencies were presumably being cured at the trial court level, an illogical and wasteful result. Moreover, because the Legislature authorized a single, thirty day extension for deficient reports, health care providers face only a minimal delay before a report's sufficiency may again be challenged and the case dismissed, if warranted.[51]

If after an extension has been granted, the defendant again moves to dismiss, we held in *Lewis v. Funderburk* that a denial of the motion is appealable.[52]

If no expert report is timely served, we held in *Badiga v. Lopez* that the denial of a motion to dismiss is appealable, even if the court grants an extension.[53] The Medical Liability Act, unlike the MLIIA, does not authorize an extension if no report is timely served. Granting an extension not authorized by section 74.351 does not preclude appeal. But because an appeal is available, we held in *In re Watkins* that review by mandamus is not available.[54]

The present case requires us to determine whether a document served on a defendant can be so lacking in substance that it does not qualify as an expert report, and therefore an immediate appeal from the denial of a motion to dismiss is available under *Badiga.*

## C

The Act defines an expert report to be

> a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed.[55]

The qualifications and experience necessary for an expert are prescribed in great detail.[56] The adequacy of a report is determined by whether it "represent[s] an objective good faith effort to comply" with

47. *In re McAllen Med. Ctr., Inc.,* 275 S.W.3d 458, 461–462 (Tex.2008).

48. Tex. Civ. Prac. & Rem.Code § 51.014(a)(9); Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 1.03, 2003 Tex. Gen. Laws 847, 849.

49. 262 S.W.3d at 321.

50. *Id.*

51. *Id.*

52. 253 S.W.3d 204, 207–208 (Tex.2008).

53. 274 S.W.3d 681, 685 (Tex.2009).

54. 279 S.W.3d 633, 634 (Tex.2009).

55. Tex Civ. Prac. & Rem.Code § 74.351(r)(6).

56. *Id.* §§ 74.351(r)(5), 74.401–.403.

the statutory definition.[57] As we have explained:

> In setting out the expert's opinions on each of those elements, the report must provide enough information to fulfill two purposes if it is to constitute a good-faith effort. First, the report must inform the defendant of the specific conduct the plaintiff has called into question. Second, and equally important, the report must provide a basis for the trial court to conclude that the claims have merit.[58]

No particular words[59] or formality[60] are required, but bare conclusions will not suffice.[61] The report must address all the elements,[62] and omissions may not be supplied by inference.[63]

■ But as we have seen, the Act allows a claimant a thirty-day period to cure deficiencies before the trial court finally determines that the report is inadequate and the claim must be dismissed. In *Ogletree*, we rejected the argument that a deficient report is no report.[64] There, the claimant provided the opinion of a radiologist, without a curriculum vitae, on a urologist's standard of care.[65] Dr. Ogletree argued that the report was really no report at all, but we held that despite its short-comings, it "implicated Dr. Ogletree's conduct", so that the trial court was authorized to grant a thirty-day extension, and an appeal was prohibited.[66]

■ *Ogletree*'s holding, though sound, can be extended only so far. To stretch the meaning of deficient to include a sheet of paper with the two words, "expert report", written on it would mock the Act's requirements. The expert report in Lewis was substantively no more than that—one physician's thank-you letter to another for referring the patient.[67] In determining where to draw the line, we are guided by two considerations. One is that the Act's principal purpose is to reduce the expense of health care liability claims. The Legislature could reasonably have determined that that purpose is served by an interlocutory appeal from the denial of a motion to dismiss for want of an adequate expert report, but as we observed in *Ogletree*, permitting two such appeals—one before the thirty-day cure period and one after—is simply wasteful. The other consideration is the goal of the Act's expert report requirement: to deter frivolous claims. An inadequate expert report does not indicate a frivolous claim if the report's deficiencies are readily curable.

---

57. *Id.* § 74.351(*l*).

58. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 879 (Tex.2001).

59. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 53 (Tex.2002) (per curiam) ("[A] report's adequacy does not depend on whether the expert uses any particular 'magical words.' ").

60. *Palacios*, 46 S.W.3d at 879 ("The report can be informal in that the information in the report does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial.").

61. *Id.* ("A report that merely states the expert's conclusions about the standard of care, breach, and causation does not fulfill these two purposes.").

62. *Id.* ("Nor can a report meet these purposes and thus constitute a good-faith effort if it omits any of the statutory requirements.").

63. *See Bowie Mem'l Hosp.*, 79 S.W.3d at 53 ("[T]he report must include the required information within its four corners.").

64. *Ogletree v. Matthews*, 262 S.W.3d 316, 320–321 (Tex.2007).

65. *Id.* at 318.

66. *Id.* at 321.

67. *Lewis v. Funderburk*, 191 S.W.3d 756, 762–763 (Tex.App.-Waco 2006) (Gray, C.J., dissenting), *rev'd*, 253 S.W.3d 204 (Tex.2008).

We conclude that a thirty-day extension to cure deficiencies in an expert report may be granted if the report is served by the statutory deadline, if it contains the opinion of an individual with expertise that the claim has merit, and if the defendant's conduct is implicated. We recognize that this is a minimal standard, but we think it is necessary if multiple interlocutory appeals are to be avoided, and appropriate to give a claimant the opportunity provided by the Act's thirty-day extension to show that a claim has merit. All deficiencies, whether in the expert's opinions or qualifications, are subject to being cured before an appeal may be taken from the trial court's refusal to dismiss the case.

## III

Dr. Marable's letter in this case easily meets this standard. Claiming expertise as a neurologist, he described the injury to Samuel's brain, ascribed it to the Physicians' breach of the standards of care, and stated that their breach caused Samuel's partial paralysis and other lingering debilities. As an expert report, Dr. Marable's letter was deficient. For example, it did not state the standard of care but only implied that it was inconsistent with the Physicians' conduct. But there is no question that in his opinion, Santillan's claim against the Physicians has merit.

The dissent argues that Dr. Marable was not qualified to give an opinion about the Physicians' conduct because he is only a neurologist, not a surgeon, and therefore his letter is so deficient it does not qualify as an expert report. The Act requires that Dr. Marable's knowledge, training or experience, and practice be "relevant" to Santillan's claim.[68] We express no view on the adequacy of Dr. Marable's qualifications; the trial court did not specifically address the matter, and it is premature for us to consider it. But the dissent's arguments, we believe, show the wisdom of our approach in determining what qualifies as an expert report.

The dissent acknowledges that, as in *Ogletree,* a radiologist is qualified to opine on "whether the urologist should have involved radiology-related devices and techniques (the specialty in which the expert was qualified) in treating the patient and whether the failure to do so resulted in injury."[69] In that instance, the dissent contends, there is an "apparent closely-related connection" between radiology and neurology.[70] The dissent sees no such connection between neurology and ENT surgery that damages the brain.[71] But surely a neurologist's expertise is relevant in explaining the connection between the Physicians' injury to blood vessels during surgery and the hemiparesis and weakness Simon suffered. What further relevance that expertise has to Santillan's claim should first be addressed by the trial court. In no event, however, do we think a claimant's opportunity to cure and a defendant's immediate right to appeal should turn on such fine distinctions, either in an expert's qualifications or in his opinions.

This case also demonstrates the difficulty with any more stringent standard. The trial court denied the Physicians' motions to dismiss and ordered that Santillan have a thirty-day extension to cure deficiencies in Dr. Marable's report nearly three years ago. Santillan had already served an amended report, in response to which the Physicians had filed renewed objections

---

68. *See* Tex. Civ. Prac. & Rem.Code §§ 74.351(r)(5), 74.401(a), (c).

69. *Post* at ——.

70. *Id.*

71. *Id.*

and again moved to dismiss the case. Now that we have dismissed this appeal for want of jurisdiction, the trial court will rule on the objections to the amended report and the motions to dismiss. Whatever the ruling, another appeal will undoubtedly follow. Our holding today will all but eliminate the first, wasteful appeal. Just as importantly, it will help assure that a claimant, after being apprised of a defendant's objections to an expert report, and having had an opportunity to discuss those objections at a hearing before the trial court, will have a fair opportunity to cure any deficiencies and demonstrate that his claim is not frivolous and should be determined on the merits.

\* \* \*

Accordingly, the judgment of the court of appeals dismissing this appeal for want of jurisdiction is

*Affirmed.*

Justice WILLETT filed a concurring opinion.

Justice JOHNSON filed a dissenting opinion, in which Justice WAINWRIGHT joined.

Justice WILLETT, concurring.

Since 2006 we have circled an issue both recurring and elusive: whether any document, even one that never accuses anyone of committing malpractice, suffices to warrant an unreviewable thirty-day extension under Section 74.351(c).[1] Until today, the issue was procedurally (and frustratingly) unreachable and thus unresolvable. Finally it is squarely presented, and I am confident today's decision will brighten the line between deficient-report cases (where an extension is discretionary) and no-report cases (where dismissal is mandatory).

\* \* \*

In a trio of concurrences in 2007,[2] 2008,[3] and 2009,[4] I focused on this nagging question: Is there a legal difference between filing nothing and filing something that amounts to nothing? That is, can a filing be so utterly lacking in the required statutory elements as to be no report at all, thus requiring dismissal? I join today's decision, which I read to confirm my consistently stated view: If a document bears zero resemblance to what the statute envisions—more to the point, *if it never asserts that anyone did anything wrong*—it cannot receive an extension.

In *Ogletree v. Matthews,* I described what I naively hoped would be "a rare bird in Texas legal practice"[5]—a plaintiff passing off as a bona fide report a document so facially absurd that, "no matter how charitably viewed, it simply cannot be deemed an 'expert report' at all, even a deficient one."[6] The deficient-or-no-report issue was not present in *Ogletree,* but I noticed it in another then-pending case, *Lewis v. Funderburk,* filed one week before *Ogletree.*[7]

In *Funderburk,* the Court confronted "an actual sighting of this rare bird, a species that in my view merits extinction, not conservation."[8] The "report" in *Funderburk* was a thank-you letter from one

---

1. *See* Tex. Civ. Prac. & Rem.Code § 74.351(c).

2. *Ogletree v. Matthews,* 262 S.W.3d 316, 323 (Tex.2007) (Willett, J., concurring).

3. *Lewis v. Funderburk,* 253 S.W.3d 204, 210 (Tex.2008) (Willett, J., concurring).

4. *In re Watkins,* 279 S.W.3d 633, 636 (Tex. 2009) (Willett, J., concurring).

5. 262 S.W.3d at 324 (Willett, J., concurring).

6. *Id.* at 323.

7. *Funderburk,* 253 S.W.3d at 209 (Willett, J., concurring).

8. *Id.*

doctor to another—a letter that never once in any manner, way, shape, or form accused anyone of malpractice.[9] This thanks-for-your-referral letter was no more a medical-expert report "than a doctor-signed prescription or Christmas card would be," I wrote, adding, "If a report is missed, not just amiss, courts are remiss if they do not dismiss."[10] Alas, the defendant did not raise the "no report" issue, thus foreclosing a merits-based challenge.[11]

Finally came *In re Watkins*, where a plaintiff merely filed a narrative of treatment, something that omitted every statutorily required element and had no apparent relationship to a medical-malpractice case.[12] Like *Funderburk*, this case also had a procedural wrinkle that kept the marquee "no report" vs. "deficient report" issue out of reach.[13] But the rare-bird sightings, I noticed, were becoming more commonplace. And they would proliferate on our docket, I predicted, absent appellate enforcement of the statute's mandato-ry-dismissal provision[14]—or alternatively, this Court's express adoption of a grace-period test that is indeed gracious, allowing extensions for most everything.

Under the Court's admittedly "lenient standard,"[15] the document must merely "[contain] a statement of opinion by an individual with expertise indicating that the claim asserted by the plaintiff against the defendant has merit."[16] The line is forgiving but bright: The "report" must actually allege someone committed malpractice. The genesis of this elemental requirement is found in *Ogletree*, where the Court first indicated that the purported report must implicate a provider's conduct.[17] It merits emphasis, however, that today's standard, benevolent as it is, is not satisfied by any medical-related piece of paper; the bar is low but not subterranean. For example, the "report" in *Funderburk* would surely fail even today's lax test. The thank-you letter in that case never mentioned malpractice by anyone,

**9.** The letter is reproduced in its entirety in Chief Justice Gray's dissent in the court of appeals. *See Lewis v. Funderburk*, 191 S.W.3d 756, 762–63 (Tex.App.-Waco 2006) (Gray, C.J., dissenting), *rev'd*, 253 S.W.3d 204 (Tex.2008).

**10.** *Funderburk*, 253 S.W.3d at 210–11 (Willett, J., concurring).

**11.** *Id.* at 208 (majority opinion) ("We do not reach the question addressed in the concurring opinions here because it is not raised. As stated in his reply brief, '[Dr.] Lewis has made it abundantly clear that he is not appealing the trial court's [initial] order (no matter how vehemently he disagrees with it),' but instead is only appealing the order denying his second motion to dismiss.").

**12.** 279 S.W.3d at 637 (Willett, J., concurring).

**13.** *Id.* at 634 (majority opinion) ("The separate writings join issue again today on the question whether the item served was a deficient report or no report at all. But here it does not matter. If no report was served, interlocutory appeal was available, so manda-mus is unnecessary. If the report was merely deficient, then an interlocutory appeal was prohibited, and granting mandamus to review it would subvert the Legislature's limit on such review.") (citations omitted).

**14.** My sense is that such sightings have indeed grown more prevalent, making Chapter 74 defendants perhaps "identify with the seaside residents of Bodega Bay, besieged by avian attacks," *In re Watkins*, 279 S.W.3d at 637 n. 13 (Willett, J., concurring) (citing THE BIRDS (Universal Pictures 1963)), or else those Arkansans who witnessed the so-called Aflockalypse last New Year's Eve, when thousands of blackbirds and starlings fell mysteriously from the skies.

**15.** 346 S.W.3d 546, 549.

**16.** *Id.* at 549.

**17.** 262 S.W.3d at 321 ("Because *a report that implicated Dr. Ogletree's conduct* was served and the trial court granted an extension, the court of appeals could not reach the merits of the motion to dismiss.") (emphasis added).

even in the most implicit or glancing manner. Again, it is not merely that the letter omitted every required statutory element. Rather, it never even hinted at having any relationship to a malpractice case at all—no mention of a claim or a defendant, much less a claim that "an individual with expertise" indicates "has merit." [18]

\* . \* \*

Based on my understanding of the Court's "minimal standard" [19]—requiring that someone with expertise express an opinion that the plaintiff has a meritorious malpractice claim against the defendant—I join the Court's decision.

Justice JOHNSON, joined by Justice WAINWRIGHT, dissenting.

The Court says that a plaintiff who timely files a defective expert report is eligible for an extension of time to cure the report if

[the report] contains a statement of opinion by an individual with expertise indicating that the claim asserted by the plaintiff against the defendant has merit. An individual's lack of relevant qualifications and an opinion's inadequacies are deficiencies the plaintiff should be given an opportunity to cure if it is possible to do so.

346 S.W.3d 546, 549. In my view the Court's standard does not conform to requirements the Legislature imposed in authorizing an extension to cure a deficient report. I respectfully dissent.

A trial court is statutorily authorized to grant an extension to cure elements of an expert report that are found deficient, not to cure a report that substantively is not a report, nor to cure a report from which

elements are absent as opposed to deficient:

(b) If, as to a defendant physician or health care provider, an expert report has not been served within the period specified by Subsection (a), the court, on the motion of the affected physician or health care provider, shall, subject to Subsection (c), enter an order that:

(1) awards to the affected physician or health care provider reasonable attorney's fees and costs of court incurred by the physician or health care provider; and

(2) dismisses the claim with respect to the physician or health care provider, with prejudice to the refiling of the claim.

(c) If an expert report has not been served within the period specified by Subsection

(a) because elements of the report are found deficient, the court may grant one 30-day extension to the claimant in order to cure the deficiency.

TEX. CIV. PRAC. & REM.CODE § 74.351(b), (c); [1] see In re Watkins, 279 S.W.3d 633, 634–35 (Tex.2009) (Johnson, J., concurring) ("The definition [of expert report] requires that for a document to qualify as a statutory expert report, it must demonstrate three things: (1) someone with relevant expertise (' "[e]xpert report" means a written report by an expert'), (2) has an opinion ('that provides a fair summary of the *expert's opinions'*), and (3) that the defendant was at fault for failing to meet applicable standards of care and thereby harmed the plaintiff...."). Absent an expert with relevant expertise, I do not see

---

**18.** 346 S.W.3d at 549. The narrative in *In re Watkins* might also fail today's test, as it lacked every required statutory element, though unlike the referral letter in *Funderburk*, it at least mentions (twice) the defendant physician's name.

**19.** *Id.* at 557.

**1.** Further references to the Civil Practice and Remedies Code will be by referring to section numbers unless otherwise indicated.

how there can be an expert report under the statute, because the foundation of an expert report is the requirement that the report be by a qualified expert. "Expert" for purposes of a report means:

> [W]ith respect to a person giving opinion testimony regarding whether a physician departed from accepted standards of medical care, an expert qualified to testify under the requirements of Section 74.401....

TEX. CIV. PRAC. & REM.CODE § 74.351(r)(5)(A). Section 74.401 provides specific requirements for an expert to be qualified to provide the section 74.351 report:

> (a) In a suit involving a health care liability claim against a physician for injury to or death of a patient, a person may qualify as an expert witness on the issue of whether the physician departed from accepted standards of medical care only if the person is a physician who:
>
> (1) is practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose;
>
> (2) has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and
>
> (3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care.

Id. § 74.401(a). The Court has said that "[a] report by an unqualified expert will sometimes (though not always) reflect a good-faith effort sufficient to justify a 30–day extension." In re Buster, 275 S.W.3d 475, 477 (Tex.2008) (per curiam) (citing Leland v. Brandal, 257 S.W.3d 204, 208

(Tex.2008)). The Court has recognized that not every doctor is qualified to render an opinion about every aspect of medicine or medical science. In re McAllen Med. Ctr., Inc., 275 S.W.3d 458, 463 (Tex.2008); Broders v. Heise, 924 S.W.2d 148, 152 (Tex.1996) ("[G]iven the increasingly specialized and technical nature of medicine, there is no validity, if there ever was, to the notion that every licensed medical doctor should be automatically qualified to testify as an expert on every medical question.").

The Court's new test apparently allows a report to qualify as a deficient report even if the report demonstrates none of the three requirements of section 74.401(a). The test requires only that the person rendering the opinion have some type of undefined level of expertise. It abandons the requirements that the report show the expert (1) has knowledge of accepted standards of care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and (2) qualifies on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care. See TEX. CIV. PRAC. & REM.CODE § 74.401(a)(2), (3). Nor does the test require a showing that the expert is practicing medicine or was doing so when the claim arose. See id. § 74.401(a)(1).

Dr. Marable's report says nothing about his surgical qualifications. The report does not give any facts or information which would qualify him to opine on the standards of care for the type of surgery performed in this case, and he did not attach a CV to the report.[2] The report was written on a letterhead showing that he maintains board certification in neurolo-

---

2. An amended report by Dr. Marable with a CV attached was filed on the day the defendants' motions to dismiss were heard. The CV was not considered by the trial court, but

it did not show that Dr. Marable had any training or expertise in the type of surgery involved here.

gy and psychiatry. In his report he makes it clear that he is basing his opinion on his expertise in neurology, not surgery: "As a board certified neurologist, my opinion is that Dr. Ducic violated the standards of care, as well as Dr. Scoresby, and as a result [Santillan's] damages are that of a right-sided hemiparesis with possibility of seizure foci in the future." The neurological expertise on which Dr. Marable relies does not involve surgery. *See* WILSON STEGEMAN, MEDICAL TERMS SIMPLIFIED 106 (1976) (noting that neurologists do not perform surgery); American Academy of Neurology, *Working with Your Doctor*, https://patients.aan.com/go/workingwith yourdoctor (last visited Apr. 18, 2011) ("Neurologists do not perform surgery."). Dr. Marable's report does not claim that he now performs or has in the past performed surgery, much less this particular type of surgery. The report neither claims that he has knowledge of the standard of care for performing the surgery nor that he is qualified on the basis of training or experience to offer an expert opinion on those standards of care. *See* TEX. CIV. PRAC. & REM.CODE 74.401(a)(2), (3). The report does not say that he has participated in, observed, or even read about how to do "procedures of left mediomaxillectomy, excision of neoplasm of the maxilla, calvarial bone growth and reconstruction of maxilla and excision of tumor of pterygopalatin structures," which were the surgical procedures performed by Drs. Scoresby and Ducic.[3] In short, nothing in Dr. Marable's report raises an inference that he is a qualified expert as to this type of surgery, as prescribed by statute, and the report is all that was before the trial court in regard to his qualifications.

In *Ogletree v. Matthews*, we considered a defendant's contention that no statutory expert report had been filed because the report was by a radiologist who was not qualified to express an opinion on the standard of care for a urologist. 262 S.W.3d 316, 319 (Tex.2007). The urologist defendant had performed a urethral catheterization during which the patient suffered bruising and bladder perforation. *Id.* at 317. We held that the radiologist's report was deficient, not absent. *Id.* at 320. But in *Ogletree* the radiologist was opining about whether the urologist should have performed the catheterization under flouroscopic guidance in order to avoid or more timely diagnose the perforation. *Id.* at 318. In that instance, the radiologist was opining about whether the urologist should have involved radiology-related devices and techniques (the specialty in which the expert was qualified) in treating the patient and whether the failure to do so resulted in injury. The matter before us is different from *Ogletree* because there is no apparent closely related connection between the expertise involved in the specialty of neurology and the expertise involved in knowing how to perform, and performing, the surgery performed by Drs. Scoresby and Ducic.

In *McAllen Medical Center*, 275 S.W.3d 458, we considered the validity of a doctor's expert reports in negligent credentialing suits against the medical center. McAllen challenged the adequacy of the reports on the basis that the doctor was not qualified to express opinions as to the credentialing process. *Id.* at 462. We agreed with McAllen and held that the reports were inadequate:

> On this record, the plaintiffs have not established Dr. Brown's qualifications. "The standard of care for a hospital is what an ordinarily prudent hospital

---

**3.** Santillan's attorney represented during oral argument that he believed Dr. Marable's amended report contained statements by Dr. Marable that he had seen surgery of this type because he had treated patients after they had the surgery.

would do under the same or similar circumstances." Nothing in the record here shows how Dr. Brown is qualified to address this standard. Nor can we infer that she may have some knowledge or expertise that is not included in the record.

Moreover, "a negligent credentialing claim involves a specialized standard of care" and "the health care industry has developed various guidelines to govern a hospital's credentialing process." Dr. Brown's reports contain no reference to any of those guidelines, or any indication that she has special knowledge, training, or experience regarding this process. Nor was Dr. Brown qualified merely because she is a physician; "given the increasingly specialized and technical nature of medicine, there is no validity, if there ever was, to the notion that every licensed medical doctor should be automatically qualified to testify as an expert on every medical question."

*Id.* at 463 (citations omitted).

The substance of the issue before us is similar to the issue we decided in *McAllen Medical Center.* Dr. Marable's report indicates that the defendants violated standards of care for the surgery and their negligent activity caused damages to Santillan. But Dr. Marable's report does not show he was qualified under the statute to give such an expert opinion, nor did his opinion about the surgeons' decisions and actions during surgery involve his specialty except to the extent a physician with his specialty would have been involved in postsurgical care and possibly a decision to reoperate.

If Dr. Marable's report had in some manner demonstrated that he was qualified to render an opinion about the standard of care for the surgery involved, then I might agree that his conclusory statements about the defendants having negligently violated applicable standards of care and those negligent activities having caused damages were sufficient to support an extension of time. But the report sets out his opinion as a neurologist, not a physician with surgical expertise. The Legislature did not intend that an expert report could be by a doctor with no demonstrated or inferable experience and training in a practice area who reads medical records and writes a report containing the simplistic indictments in the report here: the defendants negligently lacerated the brain and further surgery was required. *See* Tex. Civ. Prac. & Rem.Code § 74.401(a).

The Court says that " 'there are constitutional limitations upon the power of courts … to dismiss an action without affording a party the opportunity for a hearing on the merits of his cause.' " 346 S.W.3d at 554 (quoting *TransAmerican Natural Gas Corp. v. Powell,* 811 S.W.2d 913, 918 (Tex.1991)). I agree. But the statement does not fit here. First of all, the constitutionality of the statute is not challenged. Second, even if it were, the statutory requirement of a timely report by a qualified expert did not spring upon Santillan without warning. The requirement was in place before the surgery took place in January 2006, while suit was not filed against the defendant doctors and Tarrant County Hospital until January 2008. Santillan had time to find a qualified expert to provide the report required to show his claim had merit, if he could find such an expert.

I would hold that failure to timely serve a report by an expert qualified under the statute is not merely a deficiency in an element of the report, it is a deficiency going to the question of whether the report is competent and is entitled to be given any weight. And I would hold that it is not an expert report and the filing of such a report supports inferences that a

proper report by a qualified expert was not available, the claim lacks merit, and the claim should be dismissed.

I would reverse the judgment of the court of appeals and dismiss the case. *See Badiga v. Lopez*, 274 S.W.3d 681, 684–85 (Tex.2009).