COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS


| JANELLE THOMPSON, CRNA, | § | No. 08-20-00059-CV |
|---|---|---|
| Appellant, | § | Appeal from the |
| v. | § | 41st Judicial District Court |
| GENESIS FONG, | § | of El Paso County, Texas |
| Appellee. | § | (TC# 2019DCV1550) |

## D I S S E N T

I respectfully dissent. In my view the appeal should be dismissed for want of jurisdiction, hence my reluctance to simply concur in a judgment on the merits.

As required by section 74.351 of the Civil Practices and Remedies Code, Ms. Fong filed two documents described as compliant expert reports within 120 days of when CRNA Thompson filed her answer. TEX.CIV.PRAC.& REM.CODE ANN. § 74.351(a). Thompson timely objected to the reports. At that point, the trial court could have found the reports compliant, which would have entitled Thompson to challenge that ruling through an interlocutory appeal. *Id.* § 51.014(a)(9) (allowance of appeal). Or, the trial court could have found the reports deficient and dismissed the suit. *See id.* § 74.351(l). If it did so, Fong would have a right to appeal. *Id.* § 51.014(10). But here, the trial court followed a third option and found the expert reports deficient but, allowed Fong a thirty-day cure period. *See id.* § 74.351(c); § 74.351(l) (court may not dismiss case if report represents an objective good faith effort to comply). While the legislature has granted us

jurisdiction to hear an interlocutory appeal from a trial court's order denying all or a part of the relief in a motion to dismiss, that same provision expressly states "that an appeal may not be taken from an order granting an extension" to cure a defective expert report. *Id.* at 51.014(a)(9).

This statutory scheme generally precludes an appeal in a case such as this where the trial court finds a report deficient but grants a cure period. In *Ogletree v. Matthews*, the Texas Supreme Court held: "Thus, if a deficient report is served and the trial court grants a thirty-day extension, that decision—even if coupled with a denial of a motion to dismiss—is not subject to appellate review." 262 S.W.3d 316, 321 (Tex. 2007). The *Ogletree* court's majority opinion alluded to a binary choice between situations where a plaintiff failed to file any kind of report, and one where a deficient report was filed, but a cure period allowed. Justice Willett's concurrence suggested another prospect--a report so lacking in substance that it amounted to no report at all. *Id.* at 323 (Willett, concurring) ("In my view, there exists a third, albeit rare, category: a document so utterly lacking that, no matter how charitably viewed, it simply cannot be deemed an 'expert report' at all, even a deficient one. A document like this merits dismissal just like an absent report."). By way of example, he suggested a document like a medical or hospital record that the author "may never have intended it as [an expert medical report]." *Id.* at 323. And the court was presented with a concrete example of what Justice Willett envisioned the next year in *Lewis v. Funderburk* when a plaintiff offered as an expert report what was essentially a thank you letter from one physician to another that never accused anyone of malpractice. 253 S.W.3d 204, 206, 211 (Tex. 2008) (noting that fact but, resolving the case solely on whether the court of appeals had jurisdiction to hear interlocutory appeal from challenge to the curative report later filed); *see also Haskell v. Seven Acres Jewish Senior Care Servs.*, 363 S.W.3d 754, 760-61 (Tex.App.--Houston [1st Dist.] 2012, no pet.) (pro se plaintiff who offered as his section 74.351 expert reports a series

of letters from health care providers only describing his medical condition, but making no allegation against health care defendants).

The Texas Supreme Court closed the loop on the issue of whether a report could be deemed effectively "no report" in *Scoresby v. Santillan*, 346 S.W.3d 546 (Tex. 2011). There, the court agreed that while "a document can be considered an expert report despite its deficiencies, the Act does not suggest that a document utterly devoid of substantive content will qualify as an expert report." *Id.* at 549. But to distinguish between what is effectively "no report" from a merely deficient report, the court posited this test: "we hold that a document qualifies as an expert report if it contains a statement of opinion by an individual with expertise indicating that the claim asserted by the plaintiff against the defendant has merit." *Id.* The court describes this as a lenient test that serves two purposes: avoiding multiple interlocutory appeals and allowing plaintiffs a fair opportunity to show that their claim is not frivolous.[1]

The report at issue in *Scoresby* was no doubt deficient. A neurologist alleged that two surgeons were negligent, yet said little more than they violated the standard of care (without stating what the standard required or how it was not met). *Id.* at 551. The neurologist's report did not attach a curriculum vitae as required by the statute. *Id.* It only marginally addressed causation with a conclusory statement that bleeding from the surgery at issue led to further hospitalization and paralysis. *Id.* Nonetheless, the court found the report "easily" met its new standard for what might qualify as a "report", albeit a deficient one. *Id.* at 557.[2]

---

[1] Here for instance, Thompson could have challenged the corrected report or reports after they were filed, and if that challenge was denied, she could have pursued an interlocutory appeal of that decision.

[2] In her reply brief, Thompson directs us to the more recent case of *Loaisiga v. Cerda*, 379 S.W.3d 248 (Tex. 2012), but in that case the court only reaffirmed that *Scoresby* defines the correct test, and the *Loaisiga* court concluded the report before it met the *Scoresby* test such that the trial court could grant a thirty-day extension. *Id.* at 261-62.

Procedurally, the court of appeals in *Scoresby* had dismissed the interlocutory appeal from a trial court's order that allowed a thirty-day cure period to correct the deficiencies. The Texas Supreme Court affirmed that outcome, reiterating that when a report is filed, found deficient, but not so deficient that it could not be cured, the "defendant cannot seek review of this ruling or appeal the court's concomitant refusal to dismiss the claim before the thirty-day period has expired." *Id.* at 549 (footnotes omitted). In my view, that is what we deal with here.

For additional context, I set out the relevant portions of the two expert reports at issue.

Dr. Cecil Rene Arredondo, under the "Medical Facts" section of his two-page report, states:

> During her labor, Ms. Fong had an epidural catheter placed for labor analgesia to control pain. Postpartum, the catheter was unable to be removed. A lumbar CT scan on 10/23/17 revealed the distal end of the catheter curled at the L3 posterior epidural space.

> On 10/23/17 the consulting neurosurgeon (Dr. Hanbali) noted the CT scan showed the catheter curled and was stuck under the lamina at L2 - L3. He also noted a history of several attempts at removal by the anesthetist and perhaps other providers.

> Ms. Fong's back was operated on 10/25/17 for exploration and removal of the foreign body. Partial L2 and L3 laminectomies were performed but the catheter could not be completely removed.

Under a "Standard of Care Discussion, the report continues:

> Without commenting on the obstetrical medicine, it is a breach of the standard of care to not properly place or remove an epidural catheter either before or after labor. In fact, I have seen many epidural placements, but I have never encountered the loss of the tip of the catheter such as was done here.

> Without the benefit of additional information from the hospital chart to include a note from the person placing the catheter, it is difficult to ascertain whether the catheter was placed correctly or removed correctly. Be that as it may, it could have been placed too vigorously or at an angle or too deep causing the catheter to coil beneath the lamina. Either explanation is indicative of substandard catheter placement and technique.

The second report, authored by Dr. Sabri E. Malek, contains the same opinions, many repeated verbatim. The primary difference between the two reports is that Dr. Malek additionally

4

criticizes Dr. Hanbali for the timing of the procedure to try to remove the catheter. In his "Findings and Medical Facts" section, Dr. Malek states:

> During her labor, Ms. Fong had a continuous labor epidural catheter placed for labor pain management. Postpartum, the anesthetist failed to remove the catheter and multiple attempts made by other providers failed as well including a spinal surgeon exposing the patient to a critically invasive attempt where the risk at my professional opinion outweigh the possible benefit. A lumbar CT scan on 10/23/17 revealed the distal end of the catheter curled at the L3 posterior epidural space, that is where the entry point was originally indicating an incorrect threading of the catheter, also the curling mentioned in the radiologist reports of scans indicate a faulty threading and inappropriate placement of the catheter tip which should be few spinal segments above the entry site.

> On 10/23/17 the consulting neurosurgeon (Dr. Hanbali) noted the CT scan showed the catheter curled and was stuck under the lamina at L2-L3. He also noted, as I mentioned above in this report, a history of several attempts at removal by the anesthetist and perhaps other providers.

His "Analysis regarding Standard for Care" section tracks that of Dr. Arredondo:

> I have no comment regarding the obstetric medicine, however; it is a breach of the standard of care to not properly place or remove an epidural catheter either before or after labor. In fact, I have performed and seen many epidural placements for labor pain and general and regional·anesthesia for all types of procedures and surgeries as well as for placement for just labor pain in particular and general pain for a wide range of conditions, but I have ever encountered the loss of the tip of the catheter such as was done in the case of Mrs. Fong.

> Without the benefit of additional information from the hospital chart to include a note from the person placing the catheter, it is difficult to ascertain whether the catheter was placed correctly or removed correctly. Be that as it may, it could have been place too vigorously or at an angle or too deep causing the catheter to coil beneath the lamina. Either explanation is indicative of substandard catheter placement and technique.

Thompson urges that these reports amount to no report because they do not implicate her, do not set out the standard of care, and do not allege how she breached it. I agree the reports are deficient in all those regards, but not so deficient that the gaps cannot be filled.

There is no doubt both letter reports were intended to be reports that accused the person who placed or attempted to remove the catheter of malpractice. They are not merely a medical record or chance correspondence used as a poor substitute for a compliant medical report. In the

5

section headings, the authors attempted to address each of the core requirements of a compliant medical report. *See* TEX.CIV.PRAC.& REM.CODE ANN. § 74.351(r)(6) (an "expert report" is statutorily defined to mean one that "provides a fair summary of the expert's opinions" regarding the standard of care, how the health care provider failed to meet that standard, and the causal relationship between that failure and the injury claimed.). Thompson focuses on the language in the analysis section that does not identify a specific breach of the standard of care and alludes to further investigation ("Without the benefit of additional information from the hospital chart to include a note from the person placing the catheter, it is difficult to ascertain whether the catheter was placed correctly or removed correctly"). I read that statement in light of the background fact sections that note that after the placement and removal efforts, the distal end of the catheter is "curled at the L3 posterior epidural space." According to Dr. Malek, this placement reflects an incorrect threading of the catheter, and that the tip should have been a "few spinal segments above the entry site." To be sure, the significance of these details deserves a better explanation, but they offer a firm opinion that a mistake was made. Moreover, the fact that two practitioners, with a combined 67 years in practice had not seen a tip placement in this position offers some indicia the claim potentially has merit.

The other major thread to Thompson's argument is that neither report indicates who was responsible for the breach of the standard of care. The issue as I understand is that one CRNA placed the catheter and perhaps the other was involved in the initial efforts to remove it. The medical chart is not a part of our record, but presumably both Thompson and Robledo appear in the chart as involved with one or both functions. Both expert reports indicate that from the existing medical record, the improper position of the catheter occurred either at its original placement, or at the time of the attempted removal, and additional records are required to flesh out that opinion.

6

This situation is not appreciably different from the report in *Scoresby* which named two defendant doctors, but which did not attribute any specific act to either, as both were somehow involved in the allegedly botched surgery.

In sum, this report meets at least the minimal standard for what may be called a report under section 74.351 as described in *Scoresby*. And because the trial court determined it defective, but curable, we are without jurisdiction to hear this appeal. TEX.CIV.PRAC.& REM.CODE ANN. at § 51.014(a)(9). Hence, I cannot join the majority's merit disposition, even if it is limited to a waiver argument.

JEFF ALLEY, Justice

September 29, 2021

Before Rodriguez, C.J., Palafox, and Alley, JJ.