

**In The**
**Court of Appeals**
**Sixth Appellate District of Texas at Texarkana**

_____

No. 06-12-00056-CV
_____

MSHC THE WATERTON AT COWHORN CREEK, LLC, Appellant

V.

DONNA MILLER, INDIVIDUALLY AND AS
REPRESENTATIVE OF THE ESTATE OF NELLIE MAE JACKSON, Appellee

On Appeal from the 5th Judicial District Court
Bowie County, Texas
Trial Court No. 11C0131-005

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Chief Justice Morriss

OPINION

After a five-day stay in a Texarkana nursing and rehabilitation facility named The Waterton, Nellie Mae Jackson was admitted to a local hospital[1] where hospital personnel drained almost three liters of fluid from her bladder via catheter and where, the next day, she died.[2] As a result, Jackson's daughter, Donna Miller, filed a medical negligence lawsuit against MSHC the Waterton at Cowhorn Creek, L.L.C., which complaint set out two types of causes of action, (A) vicarious liability for the alleged acts or omissions of The Waterton's employees in the course of caring for Jackson and (B) direct liability for the company's alleged negligence in certain employment practices. The Waterton's motion to dismiss alleging fatal flaws in Miller's healthcare liability expert report was overruled by the trial court, and The Waterton appeals that denial. We affirm the denial as to the vicarious liability claims and reverse as to the direct liability claims because (1) Miller's expert report is sufficient to support her vicarious liability claims, but (2) Miller's expert report does not support her direct liability claims.

---

[1]Jackson had been admitted to the hospital earlier with weakness and dementia after a fall. Six days later, Jackson was moved to The Waterton for rehabilitation and recuperation. Miller alleges Jackson's hospital discharge summary on that date reflects diagnoses of dementia, history of cerebral vascular accident, history of middle cerebral artery aneurysm repair, history of abdominal aortic aneurysm status post repair, history of renal artery stenosis post renal stent, and chronic kidney disease, stage III. Three days after her admission to The Waterton, Jackson was started on intravenous (IV) fluids at the rate of fifty cc every hour for forty-eight hours. Two days after that she was found to have an elevated temperature, increased heart rate, low blood pressure, and difficulty breathing, triggering her readmission to the hospital.

[2]The cause of death, as reflected on the death certificate, was cardiopulmonary failure, septic shock, acute renal failure, and acute diastolic heart failure.

2

To support her lawsuit, Miller retained Milton D. Shaw, M.D., C.M.D.,[3] to provide an expert opinion against The Waterton. The Waterton filed its initial motion to dismiss Shaw's timely-filed expert report. The trial court found the report to be deficient, but granted a thirty-day extension to amend the report. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(c) (West 2011). Miller timely filed a revised report, which was again challenged. At the hearing on the motion to dismiss, The Waterton argued the report failed to identify the standard of care, breach, and causation with respect to Miller's vicarious liability claims. The Waterton further claimed the report was deficient because it was silent with respect to the direct liability claims. The trial court denied the motion to dismiss.

Miller properly sought appeal of this interlocutory order denying the motion to dismiss. *See Lewis v. Funderburk*, 253 S.W.3d 204, 208 (Tex. 2008); *Longino v. Crosswhite*, 183 S.W.3d 913, 915 (Tex. App.—Texarkana 2006, no pet.).

We review the trial court's decision regarding the adequacy of an expert report under an abuse-of-discretion standard. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002) (per curiam); *Goforth v. Bradshaw*, 296 S.W.3d 849, 851 (Tex. App.—Texarkana 2009, no pet.). An abuse of discretion occurs if the ruling in the trial court is arbitrary or unreasonable or made without reference to any guiding rules or principles. *Walker v. Gutierrez*, 111 S.W.3d 56, 62

---

[3]Shaw is board certified in internal medicine and is certified by the American Medical Directors Association as a medical director. Shaw is the medical director of the geriatrics and extended care program at the Veterans Administration (VA) Hospital in Kerrville and is assistant clinical professor of medicine at the University of Texas Medical School at San Antonio. Shaw is the medical director of two private community nursing homes in Kerrville, separate from his VA practice.

3

(Tex. 2003). Nevertheless, "a clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion . . . ." *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992).

A trial court must grant a motion to dismiss under Section 74.351 if it appears that the report does not represent a good-faith effort to comply with subsection (r)(6) or is not sufficiently specific "to provide a basis for the trial court to conclude that the claims have merit." *Am. Transitional Care Ctrs. of Tex.*, *Inc. v. Palacios*, 46 S.W.3d 873, 875 (Tex. 2001); *see* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6) (West 2011). A good-faith effort requires that the report discuss the standard of care and breach of that standard with sufficient specificity to inform the defendant of the conduct the plaintiff has called into question and to provide a basis for the trial court to conclude the claims have merit. *Jernigan v. Langley*, 195 S.W.3d 91, 94 (Tex. 2006) (per curiam). A report that merely states an expert's conclusions about the standard of care, breach, and causation does not meet the statutory requirements. *Wright*, 79 S.W.3d at 52. The trial court's review is limited to the four corners of the expert report, which need not "marshal all the plaintiff's proof," but must include the expert's opinion on each of the three main elements—standard of care, breach, and causation. *Id.*

*(1)*    *Miller's Expert Report Is Sufficient to Support Her Vicarious Liability Claims*

Miller's vicarious liability claims allege The Waterton's agents, employees, and representatives were negligent in:

a.    Failing to observe, assess, intervene, evaluate, and care for [Jackson];

b.    Failing to notice that [Jackson] did not empty her bladder for three days despite being on IV therapy, resulting in the accumulation of nearly 3 liters of fluid;

4

c.   Failing to intervene in a medical emergency on November 7, 2008;

d.   Failing to monitor [Jackson]'s known medical conditions;

e.   Failing to follow doctor's orders; and

f.   Failing to keep accurate records that charted [Jackson]'s medical condition and treatment.[4]

The Waterton contends Shaw's report is deficient because it fails to adequately identify a standard of care applicable to the facility's staff, the manner in which the staff failed to meet the standard of care, and the causal relationship between that failure and the injury, harm, or damages claimed. The report contained the following opinions:

> The standard of care for a long-term care facility and its staff such as The Waterton requires that they provide that level of care and treatment that a reasonable, prudent, similar facility would provide under the same or similar circumstances. Each resident must receive and the facility must provide the necessary care and services to attain or maintain the highest practicable, physical, mental, and psychosocial well being, as defined by and in accordance with the comprehensive assessment and plan of care.

Shaw states that the comprehensive assessment[5] must include:

> identification and demographic information; customary routine; cognitive patterns; communication; vision; mood and behavior patterns; psychosocial well-being; physical functioning and structural problems; continence; disease diagnoses and health conditions; dental and nutritional status; skin condition;

---

[4]Miller further claims The Waterton was negligent in "failing to ensure the clinical record contains all treatments given to the resident," and in failing to "maintain acceptable parameters of nutritional status, such as body weight and protein levels . . . ."

[5]The report further indicates the assessment must be completed "within 14 calendar days after admission, and within fourteen calendar days after the facility determines, or should have determined, that there has been a significant change in the resident's physical or mental condition . . . ." The Waterton takes the position that, because there were still a number of days left in which to perform the assessment, there could not have been a breach of any standard of care because Jackson was a Waterton resident for only six days. Here, the initial assessment was completed within the allotted timeframe.

activity pursuit; medications; special treatments and procedures; and discharge potential.

The report further indicates the initial assessment fell below this standard of care in that

> it failed to assess [Jackson's] respiratory condition, nutritional status, the ability to take food and fluids, or continence. Further, . . . Jackson's admission face sheet, dated November 3, 2008, failed to note the significant cardiac history and stage III renal disease listed on the Discharge Summary from St. Michael's Hospital on November 2.

Moreover, the facility must

> maintain clinical records on each resident in accordance with the accepted professional standards and practices. A complete clinical record . . . must contain enough information to show that the facility knows the status of the individual, has adequate plans of care, and provide sufficient evidence of the effects of care provided. . . . Documentation should provide a picture of the resident's progress including response to treatment, change in condition, and changes in treatment. . . . Jackson's clinical record does not reflect the deterioration in . . . Jackson's condition that resulted in her being transferred to the hospital on November 8.

Further,

> [i]n order to meet the standard of care, the nursing home and its staff must provide adequate fluid intake to prevent dehydration. This was not done. The harm/injury that resulted was severe dehydration, urosepsis, and acute renal failure, contributing to . . . Jackson's death.

In addition, "[i]n order to properly monitor a patient for dehydration, one must have an accurate measurement of liquid intake and output. There is no record in . . . Jackson's chart that permits the quantification of her urine output, and this should have been done." Likewise, Shaw notes that

> [t]he nursing home and its staff knew or should have known that . . . Jackson was at high risk for dehydration due to her multiple risk factors. . . . Jackson's risk factors were advanced age, dementia, debility, renal insufficiency, and inability to obtain liquids on her own. She was dependent upon the nursing staff to provide

6

her with adequate fluid intake. There is no documentation that the nurses tried to call the attending physician and inform him of . . . Jackson's lack of intake of food and fluids, which is clearly below the standard of care.

The care and treatment rendered to . . . Jackson by the nursing home fell below the standard of care when it failed to keep adequate clinical records as previously noted and described above. If clinical records and her accurate intake and output had been kept, it would have been readily apparent that this woman was developing dehydration and that had this been recognized earlier, it could have been successfully treated and she would, more likely than not, not have suffered dehydration, urosepsis, and acute renal failure . . . .

Shaw continues,

[i]n my opinion, as noted above, the nursing staff of The Waterton failed to adequately assess . . . Jackson, both initially and subsequently during her stay, and institute measures which could have prevented her deterioration to the point of needing hospitalization. What can be gleaned from the record is that . . . Jackson was unable to take or was not offered sufficient fluids to assure adequate hydration reflected in the laboratory values. IV fluids were started but she developed a urinary tract infection, and subsequent sepsis. It is a well-known fact that adequate fluid intake and volume depletion are significant contributors to the development of urinary tract infections. Once she developed sepsis, her system was stressed to the point that she apparently had a myocardial infarction and resultant heart failure, and died the day after readmission to the hospital.

Shaw concludes,

[i]n summary, based on my medical education, training, and direct experience, and based upon a reasonable degree of medical certainty, that the failures outlined in this report proximately caused the deterioration in her condition leading to her hospitalization, and ultimately resulting in the patient's death.

The Waterton is critical of the report because it states that the initial assessment failed to assess "respiratory condition, nutritional status, the ability to take food and fluids, or continence," and, thus, fell below the standard of care, but also indicates that the initial assessment was "cursory at best, with no significant assessment of respiratory effort, ability to

7

take food or fluids, or assessment of bowel and bladder elimination other than to mark '0.'" Based on these statements, The Waterton claims the report is contradictory. On the contrary, these statements indicate the initial assessment failed to provide useful information and, thus, fell below the standard of care.

The report is further criticized on the basis that it fails to state what an adequate assessment should include in the specific areas listed. As reflected in the report, the standard of care for preparation of the initial assessment requires that the assessment include, among other things, the resident's disease diagnoses and health conditions. The initial assessment, according to the report, failed to note significant cardiac history and stage III renal disease listed on the hospital discharge summary. Jackson's renal insufficiency, among other things, placed her at high risk for dehydration. Shaw indicates that, in order to comply with the standard of care, clinical records must contain enough information to show "the facility knows the status of the individual" including a change in condition that ultimately requires hospitalization. Here, the clinical record "does not reflect the deterioration in Mrs. Jackson's condition that resulted in her being transferred to the hospital on November 8." According to Shaw, Jackson's ADL[6] sheets "showed no documentation of intake or urinary . . . elimination to a degree which would evidence actual evaluation, even though . . . Jackson was on IV's for the 2 days prior to transfer to the hospital."

The report states that, "in order to meet the standard of care, the nursing home and its staff must provide adequate fluid intake to prevent dehydration. This was not done." Further,

---

[6]In the health care field, the acronym ADL stands for activities of daily living.

8

"[i]n order to properly monitor a patient for dehydration, one must have an accurate measurement of liquid intake and output." Shaw then notes that "[t]here is no record in . . . Jackson's chart that permits the quantification of her urine output, and this should have been done."

The Waterton complains that Shaw failed to state specifically how its staff should have monitored Jackson's fluid intake and output and what would have constituted adequate fluid intake. However, the point is not that Shaw failed to identify which of several possible monitoring methods should have been implemented; instead, as the report indicates, even though the staff knew or should have known Jackson was at an increased risk of becoming dehydrated, there were no records in the chart that would even permit a quantification of urine output.

The criticisms of The Waterton staff can be succinctly stated as the failure to maintain adequate records and assessments and a failure to monitor Jackson's physical condition, particularly her fluid intake and output. The report sets forth the standard of care for patient assessments, the maintenance of clinical records, and monitoring Jackson's physical condition and identifies specific failures on the part of the facility amounting to a breach of those standards.

As to causation and injuries, The Waterton argues that Shaw's report is conclusory because it fails to set forth the causal relationship between alleged deviations from the appropriate standard of care and Jackson's alleged injuries and death. The Waterton relies on *Jelinek v. Casas*, 328 S.W.3d 526 (Tex. 2010), in support of this proposition. In that case, the expert testified that "the Hospital's negligence 'in medical probability' caused Casas additional

9

pain and suffering." *Id.* at 535. This opinion was based on the presence of an intra-abdominal infection that could have been treated with certain antibiotics. Circumstantial evidence of infection existed, but there was no direct evidence of an infection. The expert conceded that the circumstantial evidence, on which he relied to form the opinion the patient suffered from an infection, was equally consistent with two other infections cultured from the patient's incision and blood—neither of which were treatable by the antibiotics in question. *Id.* The court held, "When the only evidence of a vital fact is circumstantial, the expert cannot merely draw possible inferences from the evidence and state that 'in medical probability' the injury was caused by the defendant's negligence." *Id.* at 536.

Here, we are not dealing with circumstantial evidence of a vital fact. Nevertheless, an expert report must include a fair summary of the causal relationship between the defendant's failure to meet the appropriate standard of care and the injury, harm, or damages claimed. TEX. CIV. PRAC. & REM. CODE ANN. § 74.352(r)(6). The Waterton complains that the report did not explain the basis for the finding that Jackson was dehydrated or how that condition, if it existed, led to her death.

The issue is whether the report articulated a causal relationship between The Waterton's alleged failure to meet the applicable standards of care and Jackson's death. *See id.* Here, the report indicates that Jackson became dehydrated at some point during her stay at The Waterton. The finding that Jackson was dehydrated is based on laboratory values.[7] This condition is not

---

[7]Shaw indicates his report is based on a review of The Waterton records and the hospital records pertaining to Jackson. Shaw states that Jackson "subsequently developed dehydration reflected in the laboratory values." On

10

documented in the initial assessment or the clinical records, and risk factors for this condition are likewise not documented in the initial assessment. Shaw states that inadequate fluid intake and volume depletion are significant contributors to the development of urinary tract infections. Jackson was readmitted to the hospital on November 8 with septic shock[8] due to urosepsis. By definition, urosepsis[9] results from urinary tract infections. Documented urosepsis "stressed Jackson's weakened system to a point that she suffered heart failure," as reflected in the death certificate. Here, the report stated that The Waterton staff failed to adequately document and monitor Jackson's condition and did not transport her to the hospital until the day before her death when it became obvious that Jackson was indeed significantly ill.

An abuse of discretion occurs only when action is taken in an arbitrary or unreasonable manner without reference to any guiding rules or principles. *Wright*, 79 S.W.3d at 52. Given this standard, we cannot conclude, as to the vicarious liability claims, there was any abuse of discretion in the finding that Shaw's report represents an objective, good-faith effort to comply with the definition of an expert report provided in subsection (r)(6). TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6). The report discusses the standard of care, breach, and causation with sufficient specificity to inform The Waterton of the conduct Miller has alleged, and it provides a

---

November 6, Jackson was started on IV fluids "presumably due to results of initial laboratory drawn on admission to The Waterton."

[8]Septic shock is a "condition of physiologic shock caused by an overwhelming infection, especially sepsis or septicemia." *Septic Shock Definition*, TheFreeDictionary.com, http://www.medical-dictionary.thefreedictionary.com/septic+shock (last visited Dec. 10, 2012).

[9]Urosepsis is "a term used imprecisely to denote infection ranging from urinary tract infection to generalized sepsis which may result from such infection." *Urosepsis Definition*, TheFreeDictionary.com, http://www.medical-dictionary.thefreedictionary.com/urosepsis (last visited Dec. 10, 2012).

basis for the trial court to conclude that the claims have merit. *See Scoresby v. Santillan*, 346 S.W.3d 546, 556 (Tex. 2011) (citing *Palacios*, 46 S.W.3d at 879). The report is sufficient as to the vicarious liability claims.

*(2)    Miller's Expert Report Does Not Support Her Direct Liability Claims*

On the other hand, Miller's claims of direct negligence include The Waterton's alleged failure to "employ sufficient staff to provide nursing and related services to maintain the highest practical physical, mental and [Jackson's] psychosocial well being," and the alleged failure to exercise ordinary care "in hiring, supervising, training, and retaining competent employees." It is undisputed that Shaw's report does not address these claims. The question before us is whether the report is sufficient to cover the direct liability claims as well as the vicarious liability claims. We conclude that it is insufficient for that purpose.

In denying the motion to dismiss Miller's direct liability claims, the trial court relied on *Certified EMS, Inc. v. Potts*, 355 S.W.3d 683 (Tex. App.—Houston [1st Dist.] 2011, pet. granted). *Potts* involved a sexual assault by a male nurse employee of Certified EMS, a nurse staffing agency. While Potts' petition alleged both direct and vicarious liability claims against Certified EMS, her expert reports did not address the direct liability claims. In its opinion affirming the trial court's order denying EMS Certified's motion to dismiss, the Court of Appeals determined Chapter 74 does not require an expert report to address each liability theory; rather, a report is sufficient if it sets out "at least one liability theory." *Id.*

In reaching this conclusion, the court recognized that the term "health care liability claim" is defined by Section 74.001(a)(13) as a "cause of action." *Id*. at 691. Because

12

Chapter 74 does not define a "cause of action," the court extracted the definition used in *In re Jorden*, 249 S.W.3d 416 (Tex. 2008) (orig. proceeding). The *Jorden* court described a "cause of action" as "a fact or facts entitling one to institute and maintain an action, which must be proved in order to obtain relief" and as a "group of operative facts giving rise to one or more bases for suing; a factual situation that entitles one person to obtain a remedy in court from another person." *Potts*, 355 S.W.3d at 691 (quoting *Jorden*, 249 S.W.3d at 421). By

> [r]eplacing the word "claim" with the term "cause of action" and its definition, the plain language in section 74.351(a) requires the claimant to file an expert report for each physician or health care provider against whom a cause of action—i.e., group of operative facts giving rise to one or more bases for suing—is asserted.

*Potts*, 355 S.W.3d at 691. Therefore,

> if at least one liability theory within a cause of action is shown by the expert report, then the claimant may proceed with the entire cause of action against the defendant, including particular liability theories that were not originally part of the expert report, as long as those liability theories are contained within the same cause of action.

*Id.* at 692. Because Potts asserted "one 'cause of action' and thus one 'claim' under chapter 74," and the expert report adequately addressed at least one theory of liability for that cause of action, denial of the motion to dismiss was upheld. *Id*. at 699–700.

Here, Shaw's report adequately addresses one theory of liability. Under the *Potts* analysis, even though the report is inadequate as to Miller's theory for direct liability, her cause of action need not be dismissed because the report would be adequate for vicarious liability. However, because we are not persuaded that *Potts* correctly interprets the expert report requirements of Chapter 74, we decline to adopt its analysis.

13

In the recent case of *Loaisiga v. Cerda*, 379 S.W.3d 248 (Tex. 2012), two female patients sued Raul Ernesto Loaisiga, M.D., and Raul Ernesto Loaisiga, M.D., P.A., together with the clinic where Loaisiga practiced, claiming they were sexually assaulted during examinations for sinus and flu symptoms. While plaintiffs maintained their claims were not health care liability claims, they nevertheless filed expert reports. The reports were attacked as insufficient, but both the trial court and the court of appeals denied Loaisiga's motion to dismiss. The issue before the high court was whether the claims were health care liability claims. The court held that the Texas Medical Liability Act creates a rebuttable presumption that a claim is a health care liability claim "if it is against a physician or health care provider and is based on facts implicating the defendant's conduct during the patient's care, treatment, or confinement." *Id*. at 256.

The high court's analysis of whether Chapter 74 applied to the professional association (the "P.A.")—in light of the fact that the petition named the P.A. as a defendant and sought judgment against it, but did not otherwise mention the P.A.—is relevant here. The court referenced Section 74.351(a), which requires an expert report "for each physician or health care provider against whom a liability claim is asserted." TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a) (West 2011). The term "liability claim" in Section 74.351(a) is simply shorthand, said the court, for "health care liability claim," which is "elsewhere defined in the TMLA as a 'cause of action.'" *Loaisiga*, 379 S.W.3d at 262. A "cause of action" means the "fact or facts entitling one to institute and maintain an action, which must be alleged and proved in order to obtain relief." *Id*. at 255 (citing *Jorden*, 249 S.W.3d at 421). "Therefore, the expert report

14

requirements are triggered when a plaintiff names a person or entity as a defendant and seeks to obtain relief from that defendant based on facts that possibly implicate the TMLA." *Id.*[10]

In this case, unlike *Loaisiga*, the issue is whether the report must address both direct and vicarious liability theories asserted against a single health care provider. Nevertheless, the high court's analysis is instructive here to the extent the *Jorden* definition of a "cause of action"—i.e., "facts entitling one to institute and maintain an action, which must be alleged and proved in order to obtain relief"—is used to determine *when* an expert report is required, rather than *what* such a report should include. Conversely, in *Potts*, the defined cause of action was used to parse the contents of the report. The contents of the report are correctly governed by Section 74.351(r)(6), which states that the report must provide

> a fair summary of the expert's opinions as of the date of the report regarding the applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed.

TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6). The facts required to establish direct liability here are qualitatively different from the facts necessary to establish The Waterton's vicarious liability for the acts or omissions of its staff. The purpose of the expert report requirement is twofold—it must inform the defendant of the conduct the plaintiff has called into question and it must provide a basis for the trial court to conclude that the claims have merit. *Jernigan*, 195 S.W.3d at 94. This dual purpose would be frustrated if a claimant could seek recovery against a medical or health care provider by pleading a theory of liability covered by

---

[10]The court noted that the plaintiff's claims against the P.A. were that it was vicariously liable for Loaisiga's conduct, and the expert report requirements apply to the claims against the P.A. just as they do to the physician individually. *Id*. at 263.

15

Chapter 74, yet submit a report that fails to identify the standard of care, breach, and causation with respect to that theory or claim. Therefore, in order to fulfill the requirements of Chapter 74, the expert report must separately and adequately address both vicarious and direct liability claims. *See Fung v. Fischer*, 365 S.W.3d 507, 523 (Tex. App.—Austin 2012, no pet.) (expert report must address both vicarious and direct liability claims); *see also Hendrick Med. Ctr. v. Miller*, No. 11-11-00141-CV, 2012 WL 314062, at *3 (Tex. App.—Eastland Jan. 26, 2012, no pet.) (mem. op.) (expert report must separately address direct and vicarious liability claims); *Binzer v. Alvey*, 359 S.W.3d 364, 366 (Tex. App.—Fort Worth 2012, pet. denied) (report that sufficiently addressed some pled theories of liability but not others is "deficient, but curable"). Because Shaw's report failed to address Miller's direct liability claims, those claims cannot stand.

We, therefore, affirm the trial court's order to the extent it overrules The Waterton's motion to dismiss Miller's vicarious liability claims. We reverse the trial court's order only to the extent it denied dismissal of Miller's direct liability claims against The Waterton, and we render judgment dismissing those claims.

Josh R. Morriss, III
Chief Justice

Date Submitted: October 4, 2012
Date Decided: December 14, 2012