

# COURT OF APPEALS
**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

**NO. 02-14-00091-CV**

CONSULTANTS IN RADIOLOGY,      APPELLANTS
P.A., JASON W. SKILES, D.O.,
DAVID W. SIMONAK, D.O., AND
FOSSIL CREEK FAMILY MEDICAL
CENTER, P.A.

V.

S.K. AND C.K., INDIVIDUALLY,      APPELLEES
AND ON BEHALF OF J.K., A.K.,
AND R.K., MINOR CHILDREN

----------

FROM THE 141ST DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

This is a health care liability case. Appellees S.K. and C.K., individually

and on behalf of J.K., A.K., and R.K., minor children, sued Appellants

---

[1]*See* Tex. R. App. P. 47.4.

Consultants in Radiology, P.A. (Radiology), Jason W. Skiles, D.O., David W. Simonak, D.O., and Fossil Creek Family Medical Center, P.A. (Fossil Creek) for negligence related to medical services provided by Appellants to S.K. In January 2013, S.K. was diagnosed with Stage IIIC breast cancer, and Appellees alleged that Appellants could have and should have diagnosed the cancer at an earlier stage. In one issue, Appellants ask whether the trial court abused its discretion by concluding that Appellees' expert reports were sufficient under civil practice and remedies code section 74.351[2] when the expert reports "fail[ed] to explain why or how the cancer worsened during the delay allegedly caused by Appellants." Because we hold that the expert reports were sufficient, we affirm.

**Standard of Review and Applicable Law**

We review a trial court's ruling on a motion to dismiss under section 74.351 for an abuse of discretion.[3] A plaintiff in a health care liability claim must provide an expert report in support of the claim.[4] The reports must set out "a fair summary of the expert's opinions . . . regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed

---

[2]Tex. Civ. Prac. & Rem. Code Ann. § 74.351 (West Supp. 2013).

[3]*Maris v. Hendricks*, 262 S.W.3d 379, 383 (Tex. App.—Fort Worth 2008, pet. denied).

[4]Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a).

to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed."[5]

An expert report must meet three elements: (1) "it must fairly summarize the applicable standard of care;" (2) "it must explain how a physician or health care provider failed to meet that standard;" and (3) "it must establish the causal relationship between the failure and the harm alleged."[6] If a report satisfies these elements as to any theory of liability against a defendant, the plaintiff may proceed on the suit against that defendant.[7]

Upon a defendant's motion, the trial court must dismiss the claims against the defendant if the plaintiff's expert report does not represent an objective good faith effort to comply with these requirements.[8] A report qualifies as an objective good faith effort if the report "(1) inform[s] the defendant of the specific conduct the plaintiff questions, and (2) provide[s] a basis for the trial court to conclude that the plaintiff's claims have merit."[9] The report "meets the minimum qualifications for an expert report under the statute 'if it contains the opinion of an

---

[5]*Id.* § 74.351(r)(6).

[6]*Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 630 (Tex. 2013).

[7]*Id.*

[8]Tex. Civ. Prac. & Rem. Code Ann. § 74.351(*l*).

[9]*Loaisiga v. Cerda*, 379 S.W.3d 248, 260 (Tex. 2012).

individual with expertise that the claim has merit, and if the defendant's conduct is implicated.'"[10]

## Analysis

Appellees alleged that on September 19, 2011, S.K. went to Fossil Creek complaining of breast tenderness and pain. She was seen by Brenda Wilmore, a nurse practitioner, who did not perform a physical examination. Dr. Simonak, S.K.'s primary care physician, made a referral for a mammogram and ultrasound.

On September 22, 2011, Dr. Skiles performed and interpreted the mammogram. Dr. Skiles reported "indeterminate microcalcifications in the left breast, probably benign" and recommended a follow-up study in three to six months. S.K. alleged that in fact, the mammogram showed "a highly suspicious cluster of microcalcifications in the upper outer quadrant of the left breast, with adjacent groups of microcalcifications raising the possibility of multifocal disease," which should have led Dr. Skiles to recommend a biopsy. Dr. Skiles's report was sent to Dr. Simonak at Fossil Creek, but neither he nor anyone else at Fossil Creek informed S.K. of the abnormal results or that she should have a follow-up study done within three to six months.

Between September 2011 and January 2013, S.K. went to Fossil Creek to see Dr. Simonak or Nurse Wilmore multiple times for various medical reasons.

---

[10]*Id.* (quoting *Scoresby v. Santillan*, 346 S.W.3d 546, 557 (Tex. 2011)).

4

In none of those visits to Fossil Creek was she informed of her abnormal mammogram results.

In January 2013, S.K. consulted Dr. Mary Brian, a breast specialist, who performed an in-office biopsy that "revealed high grade ductal carcinoma in situ [(DCIS)]." The next month, Dr. Brian performed a mastectomy and left sentinel node biopsy. Subsequent testing showed that S.K.'s cancer had spread to the lymph nodes, leading to a diagnosis of multifocal Stage IIIC invasive ductal carcinoma. She has since undergone chemotherapy and radiation therapy, and her prognosis is "very poor."

Appellees alleged that Dr. Simonak was negligent in, among other acts, failing to properly supervise Nurse Wilmore, failing to communicate and explain the abnormal mammogram findings to S.K.; failing to adequately monitor S.K.; and failing to render proper and timely care to S.K. to prevent the progression of the cancer. They alleged that Dr. Skiles was negligent by, among other acts, failing to accurately interpret and report S.K.'s mammogram; failing to recognize the presence and significance of the mammogram results; and failing to recommend that S.K. have a prompt biopsy.

Appellees served Appellants with the expert reports of Dr. Peter D. de Ipolyi, M.D., Dr. Suraj Achar, M.D., and Dr. Jeffrey B. Mendel, M.D. Appellants filed objections to each expert report and motions to dismiss based on those objections. Among other objections, Appellants complained that the reports were

not adequate as to causation. The trial court denied Appellants' motions to dismiss, leading to this appeal.

On appeal, Appellants make three main arguments about the reports' discussion of causation: (1) the reports did not discuss when S.K.'s lymph nodes became positive for cancer or how the lymph nodes became involved during the delay in diagnosis and treatment, (2) the reports did not account for the fact that during the period in which S.K. was not diagnosed, she was pregnant, and (3) aside from a lack of discussion of the lymph nodes, the reports did not explain how the delay caused S.K.'s diagnosis to worsen.

As for the first argument, Appellants did not raise in the trial court any question about the failure to discuss lymph nodes, and the excerpts from the Cancer Staging Manual they rely on here were not presented to the trial court. The trial court therefore did not have this information in deciding whether the reports adequately discussed causation. In determining whether the trial court abused its discretion, we look at the information that the trial court had before it at the time of its ruling.[11] We therefore will not consider this information in deciding whether the trial court abused its discretion in determining that the expert reports made a good faith effort at complying with statutory requirements.

---

[11] *See Finley v. Steenkamp*, 19 S.W.3d 533, 540 n.3 (Tex. App.—Fort Worth 2000, no pet.) (stating that we review the actions of a trial court based on the evidence before the court at the time it acted); *Methodist Hosps. of Dallas v. Tall*, 972 S.W.2d 894, 898 (Tex. App.—Corpus Christi 1998, no pet.) ("It is axiomatic that an appellate court reviews actions of a trial court based on the materials before the trial court at the time it acted.").

6

As for the second argument, from the record, S.K. found out she was pregnant in December 2011, and the experts all complained about Appellants' failure to act in September 2011. The evidence does not show that she was pregnant in September 2011. Accordingly, the argument that the reports were inadequate because they did not account for S.K.'s pregnancy is unpersuasive.

As to their third argument about causation, Appellants make two subarguments. They complain that the reports asserted that but for Appellants' negligence, S.K. would have been diagnosed in September 2011 or soon after with DCIS and S.K.'s prognosis would have been good, but in January 2013, Dr. Brian did what the reports say Appellants should have done, and even she diagnosed DCIS, not Stage IIIC. Thus, either (i) S.K. had DCIS in January 2013, and it only spread after that time (in which case, Appellants' negligence did not cause S.K.'s injuries), or (ii) a biopsy alone cannot determine whether a lymph node will contain cancer, so even if Appellants had done exactly what the reports say they should have done, the outcome would have been the same.

With respect to subargument (ii)—that the reports suggest that a biopsy alone cannot adequately diagnose a cancer stage and therefore Appellants' compliance with the standard of care would have led to the same result—Dr. Brian's biopsy led to a cancer diagnosis, which led to treatment. The expert reports asserted that following the standard of care in September 2011 would have led to an *earlier* diagnosis and *earlier* treatment with a less invasive treatment approach, and that "[t]umor size and involvement of lymph nodes often

7

depends specifically on the time of detection." And the opinions in the expert reports were based, not just on the results of a biopsy, but also on reading the September 2011 mammogram. Thus, an argument that a biopsy alone does not lead to a correct diagnosis does not address Appellees' allegations of negligence.

As to subargument (i)—that S.K.'s cancer did not spread until after she was seen by Dr. Brian—Appellants argue that "Dr. Mary Brian . . . diagnosed [DCIS] after Appellants' involvement ceased. Dr. Brian found exactly what the experts believed should have been found earlier," and "[i]f Dr. Brian's biopsy report was correct, S.K. and her family have suffered no harm by the delay." But Dr. Brian's diagnosis of DCIS was based on an initial biopsy. Less than a month later, she performed a mastectomy and left sentinel node biopsy, and pathology showed that the cancer had spread to the lymph nodes. Consequently, S.K. was diagnosed with multifocal Stage IIIC invasive ductal carcinoma. Appellees' allegation, and that of their experts, has been that if S.K. had been treated in accordance with the standard of care, her cancer would have remained noninvasive, she would not have had to have chemotherapy, and her prognosis would have been good. But because the cancer was not timely diagnosed, the cancer became invasive, chemotherapy was required, and her prognosis is poor.

Dr. Achar's report stated that "[i]nformation sharing, more likely than not, would have led [S.K.] to the conclusion that she would like to see a specialist like the specialist who ultimately diagnosed her," and that the failure to share led her

8

to "falsely believe that her breast symptoms were not cancer, delayed the ultimate diagnosis, and worsened her outcome." Dr. Mendel stated in his report that if the abnormalities had been correctly identified and reported with a recommendation for a biopsy, then a biopsy would have been performed, and S.K.'s diagnosis would likely have been reached within days.

In his report, Dr. de Ipolyi stated that "[h]ad Dr. Skiles properly recommended a biopsy following the September 22, 2011 mammogram, more likely than not a Fine Needle Aspiration Biopsy (FNAB) or Core Needle Biopsy (CNB) would have been performed within a short period," and that if the biopsy been performed three to six months following the 2011 mammogram, it would have resulted in S.K. being diagnosed with DCIS.

He further stated:

> DCIS refers to a cancer started in a duct (the tube that carries the milk from the lobule to the nipple) that has not spread to the nearby breast tissue or other organs.). DCIS is the most treatable form of breast cancer that carries the best prognosis. Had [S.K.] been properly diagnosed shortly after the mammogram, or shortly after the recommended follow-up period, her treatment would have most likely been lumpectomy with radiation or mastectomy surgery. Chemotherapy is not required for DCIS, and [S.K.]'s prognosis would have been excellent. By definition, there is no risk of distant recurrence since the cancer is noninvasive. For women having lumpectomy with radiation, the risk of local recurrence ranges from 5–15 percent. For women having mastectomy, the risk of local recurrence is less than 2 percent. Large clinical trials, conducted by the National Surgical Adjuvant Breast and Bowel Project, show that the overall 15 year survival rate exceeded 85%, with the incidence of death from breast cancer less than 5 percent. Quite simply, with timely follow-up exams and biopsy, [S.K.] would likely not have required chemotherapy and/or died from breast cancer.

9

> Because Dr. Skiles, Dr. Simonak, and [Fossil Creek] failed to provide timely/proper follow-up and care, [S.K.]'s breast cancer was not diagnosed and treated before it spread. Pathology following her February 2013 surgery revealed multiple positive lymph nodes (14 out of 28) and she was diagnosed with multifocal Stage IIIC invasive ductal carcinoma. The treatment and prognosis for this cancer is vastly different than DCIS. Treatment for multifocal Stage IIIC invasive ductal carcinoma involves modified radical mastectomy surgery (removing the whole breast that has cancer, many of the lymph nodes under the arm, the lining over the chest muscles, and often part of the chest wall muscles) followed by radiation therapy (using high-energy x-rays or radiation to kill cancer cells or keep them from growing) and chemotherapy (using drugs to stop the growth of cancer cells, either by killing the cells or by stopping them from dividing). Based upon the most recent numbers published by the National Cancer Data Base, [S.K.] has a less than 50% chance of surviving 5 years, even with the best treatment available.

And he stated that the failure in September 2011 "to conduct and document a physical examination prevented healthcare providers from being aware of the clusters of abnormal tissue in [S.K.]'s left breast, much less tracking its size/appearance over time." Thus, as to Appellants' arguments that the expert reports do not show how the cancer progressed during the period of delay, and they therefore do not show that S.K.'s prognosis worsened because of the delay, this expert report points out that it was Appellants' negligence that prevented S.K. from being able to demonstrate precisely when her cancer spread.

We hold that the expert reports were sufficient as to causation. These reports made a good faith effort at informing the trial court and Appellants of the causal relationship between the Appellants' failures and the harm alleged by Appellees. Accordingly, we overrule Appellants' sole issue.

10

**Conclusion**

Having overruled Appellant's sole issue, we affirm the trial court's order.


                                        /s/ Lee Ann Dauphinot
                                        LEE ANN DAUPHINOT
                                        JUSTICE

PANEL:  LIVINGSTON, C.J.; DAUPHINOT and MEIER, JJ.

DELIVERED:  June 26, 2014