

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-14-00060-CV

D.W., AS NEXT FRIEND OF M.M.W. AND T.F.W., MINOR CHILDREN, AND THE INDEPENDENT ADMINISTRATOR OF THE ESTATE OF K.H., DECEASED; DEBORAH HARRIS, INDIVIDUALLY, AS NEXT KIN OF K.H., DECEASED; AND CLARENCE HAYNES, INDIVIDUALLY, AS NEXT KIN OF K.H., DECEASED

APPELLANTS

V.

RAJA SAWHNEY, M.D.

APPELLEE

----------

FROM THE 17TH DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 17-265501-13

----------

## MEMORANDUM OPINION[1]

----------

---

[1]See Tex. R. App. P. 47.4.

This is a health care liability case. Appellants D.W. (as Next Friend of M.M.W. and T.F.W., Minor Children, and the Independent Administrator of the Estate of K.H., Deceased); Deborah Harris (Individually, as Next Friend of K.H., Deceased); and Clarence Haynes (Individually, as Next Friend of K.H., Deceased) (collectively Family) sued Appellee Dr. Raja Sawhney and others after the death of K.H. In a prior opinion, this court considered the adequacy of the expert report of Dr. Neal Gerstein as to the hospital at which K.H. died.[2] We held in that case that Dr. Gerstein's report was adequate.[3] In this case, Family appeals from the dismissal of its claims against Dr. Sawhney, the ear, nose, and throat (ENT) doctor who performed the surgery that led to K.H.'s death.

Family initially served Dr. Sawhney with Dr. Gerstein's report, but after the trial court sustained Dr. Sawhney's objections to the report, it served Dr. Sawhney with an expert report by Dr. Douglas K. Holmes, an ENT doctor. After the trial court dismissed Family's claims against Dr. Sawhney, it filed this appeal. Family argues in one issue that the trial court abused its discretion by dismissing its claims against Dr. Sawhney. Because we hold that the expert report served by Family represents a good faith effort to comply with the expert report requirement, we reverse the trial court's order dismissing Family's claims.

---

[2]*Wiley v. Baylor All Saints Med. Ctr. at Fort Worth*, No. 02-13-00375-CV, 2014 WL 888452, at *2, *4 (Tex. App.—Fort Worth Mar. 6, 2014, no pet.) (mem. op.).

[3]*Id.* at *4.

*K.H.'s Death at Baylor Hospital*

The alleged facts giving rise to this suit are as follows. In February 2011, K.H. was admitted to Harris Methodist Hospital with pneumonia, acute exacerbation of asthma, and respiratory difficulty due to tracheal stenosis. K.H. had a history of subglottic stenosis. While at that facility, K.H.'s condition initially improved but then worsened. A doctor there believed that K.H. had an acute pulmonary edema secondary to the stenosis and that she would benefit from a laser procedure to dilate the stenosis. He recommended that she be transferred to Baylor All Saints Medical Center at Fort Worth for that procedure. K.H. was transferred to Baylor in stable condition.

At Baylor, members of its ENT and pulmonology departments examined K.H. She was scheduled for a bronchoscopy by Dr. Raja Sawhney, an otolaryngologist. Dr. Adam Lenz was the attending anesthesiologist. Brian Birmingham, a certified registered nurse anesthetist, attempted to intubate K.H. with a #6 endotracheal tube (ETT) but failed. A second attempt by Dr. Lenz was successful.

For reasons not clear from K.H.'s medical records, this tube was removed, and an attempt was made with a #8 tube. After an unspecified number of unsuccessful attempts with the #8 tube, intubation was tried with a #7 tube, but this attempt was also unsuccessful. The medical records are not clear as to who removed the #6 tube and tried the larger tubes. The #6 tube was then reinserted.

3

K.H. began deteriorating, and although attempts at resuscitation were made, she ultimately died. After K.H.'s death, the autopsy determined that her cause of death was a 2 cm x 2 cm perforation in the trachea wall. Family sued Baylor, NorthStar Anesthesia, P.A., Birmingham, Dr. Lenz, and Dr. Sawhney.

Family served Dr. Sawhney with the expert report of Dr. Gerstein. Dr. Sawhney filed objections to the report and a motion to dismiss arguing that Dr. Gerstein's report was deficient because it (1) failed to demonstrate that Dr. Gerstein was qualified to render expert opinions as to Dr. Sawhney, an ENT surgeon, (2) failed to establish a standard of care applicable to Dr. Sawhney and how that standard of care was breached, and (3) failed to establish causation.

*The proceedings in this case*

In this court's opinion in the appeal against Baylor, we stated that "Dr. Gerstein's report set out a standard of care, a breach of that standard, and causation as to Dr. Sawnhey."[4] Before we issued our opinion in that case, however, the trial court sustained Dr. Sawhney's objections to Dr. Gerstein's report and granted Family's request for a thirty-day extension to cure the deficiencies. Family then filed the expert report of Dr. Holmes.

Dr. Sawhney filed objections to Dr. Holmes's report and a motion to dismiss Family's claims against him. The motion stated that Dr. Holmes's report showed that he was qualified to opine on the standard of care with respect to Dr.

---

[4]*Id.*

4

Sawhney but failed to cure the deficiencies of the prior report regarding the standard of care, breach, and causation.  The trial court granted Dr. Sawhney's motion and dismissed Family's claims.  Family now appeals.

*Standard of Care and Applicable Law*

We review a trial court's ruling on a motion to dismiss under civil practice and remedies code section 74.351 for an abuse of discretion.[5]  We also review a trial court's determination of an expert's qualifications for an abuse of discretion.[6]

A plaintiff asserting a health care liability claim must provide an expert report in support of the claim.[7]  An expert report must meet three elements:  (1) "it must fairly summarize the applicable standard of care"; (2) "it must explain how a physician or health care provider failed to meet that standard"; and (3) "it must establish the causal relationship between the failure and the harm alleged."[8]  If a report satisfies these elements as to any theory of liability against a defendant, the plaintiff may proceed on the suit against that defendant.[9]

---

[5]*Maris v. Hendricks*, 262 S.W.3d 379, 383 (Tex. App.—Fort Worth 2008, pet. denied).

[6]*Granbury Minor Emergency Clinic v. Thiel*, 296 S.W.3d 261, 266 (Tex. App.—Fort Worth 2009, no pet.).

[7]Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a) (West Supp. 2013).

[8]*Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 630 (Tex. 2013).

[9]*Id.*

5

Upon a defendant's motion, the trial court must dismiss the claims against the defendant if the plaintiff's expert report does not represent an objective good faith effort to comply with these requirements.[10] A report qualifies as an objective good faith effort if the report "(1) inform[s] the defendant of the specific conduct the plaintiff questions, and (2) provide[s] a basis for the trial court to conclude that the plaintiff's claims have merit."[11] The report "meets the minimum qualifications for an expert report under the statute 'if it contains the opinion of an individual with expertise that the claim has merit, and if the defendant's conduct is implicated.'"[12]

*Analysis*

Dr. Holmes's report included at least two standards of care, the breach of which had, in his opinion, caused K.H.'s death. First, Dr. Holmes discussed the insertion and removal of the larger ETTs. As to the standard of care, Dr. Homes stated that "[a] thorough knowledge of the outer dimensions of any endotracheal tube to be inserted in the trachea of this patient should be considered in the context of [K.H.'s] tracheal dimensions prior to anesthesia induction." "The placement of the 6.0 [ETT] which has an outer diameter measurement of 8.2 mm was within the applicable standard of care." "[A] 6.0 ETT was the largest tube

---

[10]Tex. Civ. Prac. & Rem. Code Ann. § 74.351(*l*).

[11]*Loaisiga v. Cerda*, 379 S.W.3d 248, 260 (Tex. 2012).

[12]*Id.* (quoting *Scoresby v. Santillan*, 346 S.W.3d 546, 557 (Tex. 2011)).

6

which could be inserted safely without compromising or injuring the patient's narrowed trachea," and "if a larger ETT was needed for some reason at that point [after the 6.0 ETT was inserted], the surgical plan should have been modified or the procedure should have been terminated."

As for a breach of the standard of care, Dr. Holmes stated that "[t]o remove the 6.0 ETT and attempt to insert an 8.0 ETT (outer diameter measurement of 11 mm) or a 7.0 ETT (outer diameter of 9.6 mm) into the severely narrowed airway of this patient was a deviation from the acceptable standard of care in the treatment of this patient."  "According to the intraoperative records, either Dr. Sawhney or the anesthesiology team removed the 6.0 ETT and unsuccessfully tried to insert first an 8.0 ETT and then followed unsuccessfully with a 7.0 ETT." But "[t]o attempt to insert an endotracheal tube greater than a size 6.0 (inner diameter) was negligent of the surgical and anesthesiology teams."

As for causation of K.H.'s death due to the breach of the standard of care, Dr. Holmes stated:

> Unable to place either of these tubes, a 6.0 ETT was reinserted. The attempts at placing each of the larger (7.0, 8.0) ETTs and re-inserting of the 6.0 ETT fell below the standard of care for this patient and in all medical probability caused the fatal injury to her trachea.

He stated that "Dr. Sawhney, as the surgeon, should not have placed or allowed the larger tubes to be placed into this patient's narrowed trachea."  And "[t]he medical record is unclear as to how many attempts to place the 7.0 ETT and 8.0 ETTs into the airway of the patient were made," but "[u]ndoubtedly, the force of

7

attempting to insert and remove these larger ETTs and replacing the 6.0 ETT in all medical probability led to the lethal injury of the patient's perforated trachea."

A second breached standard of care that led to K.H.'s death as set out by Dr. Holmes was Dr. Sawnhey's failure to perform a tracheotomy when it was needed. Regarding the standard of care and the breach of that standard, Dr. Holmes stated that "a 6.0 ETT was the largest tube which could be inserted safely without compromising or injuring the patient's narrowed trachea," and after the 6.0 ETT was placed after two intubation attempts, "[i]t was incumbent upon Dr. Sawhney to make the decision as to whether he could perform his surgical procedure with the 6.0 ETT in place or possibly with the intermittent removal/replacement of the 6.0 ETT." "The standard of care in this case called for Dr[.] Sawhney to perform a tracheotomy after the initial placement of the 6.0 tube and realizing he could neither perform his dilation no[r] ventilate the patient well with the 6.0 tube." "The patient needed a larger airway than that afforded by a 6.0 tube," and "[b]y the CT measurement, it should have been clear that the airway was not large enough to allow a 7.0 or 8.0 tube." "Instead, she needed a tracheototomy to secure a safe airway."

As for causation, Dr. Holmes stated that "[h]ad th[e] tracheotomy been performed [as called for by the applicable standard of care] after the initial 6.0 intubation, the patient would have in all reasonable medical probability not suffered the perforation of her trachea," an injury he described as "lethal."

8

We hold that Dr. Holmes's expert report informed Dr. Sawhney of the specific conduct that Family questions and provided a basis for the trial court to conclude that Family's claims have merit, and as such, it qualified as an objective good faith effort to comply with the requirements of section 74.351.[13] Accordingly, the trial court abused its discretion by dismissing Family's claims against Dr. Sawhney. We sustain Family's sole issue.

Having sustained Family's sole issue, we reverse the trial court's order dismissing Family's claims against Dr. Sawhney, and we remand this case for further proceedings.

/s/ Lee Ann Dauphinot
LEE ANN DAUPHINOT
JUSTICE

PANEL: DAUPHINOT, GARDNER, and MEIER, JJ.

DELIVERED: July 3, 2014

---

[13] *See id.*