**Affirmed and Memorandum Opinion filed August 23, 2018.**



**In The**

# Fourteenth Court of Appeals

---

## NO. 14-17-00532-CV

---

### DARNELL PETTWAY, M.D., Appellant

### V.

### MARIA OLVERA, Appellee

---

**On Appeal from the 281st District Court**
**Harris County, Texas**
**Trial Court Cause No. 2016-33632**

---

## M E M O R A N D U M   O P I N I O N

Appellee Maria Olvera brings a health care liability claim against appellant Darnell Pettway, M.D. The trial court denied Pettway's Chapter 74 motion to dismiss based on alleged deficiencies of Olvera's expert report. *See* Tex. Civ. Prac. & Rem. Code 74.351. We affirm.

# I.    BACKGROUND

Olvera sprained her ankle and went to a hospital. Olvera's ankle was splinted, and she was ordered to remain non-weight bearing on the sprained ankle. Her treating physician at the hospital, Pettway, ordered crutches be given to her. Pettway did not inform Olvera how to use the crutches.

Olvera was provided the crutches and left unsupervised. She attempted to walk with the crutches although she did not know how to use them. She fell on the concrete floor and injured her head, shoulder, and neck. She suffered a concussion, underwent surgery on her shoulder, and has been recommended surgery on her neck.

Olvera sued Pettway, among others. Pursuant to Chapter 74 of the Civil Practice and Remedies Code, Olvera filed an expert report by Charles Xeller, M.D., P.A. In the report, Xeller describes the standard of care:

> . . . Dr. Pettway ordered for crutches be given to Ms. Olvera to facilitate in being non-weight bearing. As is customary with such a recommendation, the standard of care when providing a patient with crutches, is for the patient to be instructed in the appropriate use of the ambulatory assistive device, such as crutches, prior to allowing the patient to ambulate alone with the crutches. Specifically, the standard of care is for the doctor to tell the patient what the crutches are for, explain to the patient the proper positioning of the body when standing straight and holding the crutches, how to hold the crutches, how to walk, sit, and move around with the crutches, where to put the crutches, and to explain the importance of walking safely to avoid additional injuries. The standard of care also includes the supervision and help of the patient in ambulating with the crutches. The patient should not be given the crutches and allowed to move alone and unsupervised. This instruction and supervision on the proper and safe use of crutches must be done primarily by the physician, who has a higher obligation to ensure the patient understands the use of crutches in order to prevent a fall and further injury to the patient. Additional instructions and demonstration on how to use the crutches should be provided by the nurse, under direct supervision of the ordering physician, in this case

Dr. Pettway. Furthermore, as part of the standard of care when training an individual such as Ms. Olvera on the use of crutches, is for the doctor to ensure that appropriate precautions to prevent a fall are in place, such as training the patient to walk on rugs, having an area with hand rails or grab bars nearby, ensuring the patient has proper foot wear and there is proper lighting.

Xeller opines that Pettway breached this standard of care by failing to provide any instructions to Olvera on how to use the crutches, failing to ensure that fall precautions were used, and failing to supervise Olvera's use of the crutches.

Xeller states that Olvera was left unsupervised by the nurse and walked with the crutches without knowing how to use them. Xeller states, "Due to the failure of Dr. Pettway to properly provide adequate instructions to the nurse and Ms. Olvera on the use of crutches and failing to order and ensure there were appropriate fall precautions in place, Ms. Olvera did not know how to use the crutches and fell and hit her head and body on the concrete floor."

Xeller describes the injuries to Olvera's head, neck, and shoulder. She suffered a concussion, headaches, and neck pain. She also suffered a rotator cuff injury requiring surgery for "debridement and a tenodesis of the long head of the biceps tendon that was found to be partially ruptured from the superior labrum due to the fall while using the crutches." An orthopedic surgeon recommended a cervical spine operation for the injury to Olvera's neck.

Finally, Xeller describes his qualifications as a board certified orthopaedic surgeon who has been practicing medicine since 1980. He explains, "As an Orthopaedic surgeon I not only order crutches for my patients with injuries similar to Ms. Olvera and train them on the proper use in a safe environment ensuring the surface they walk on is safe, but also that they have handrails to hold onto in case of a fall." Further, he describes his experience during residency training: "our duties

included fitting and adjusting the crutches, instructing on the proper manner and way in which to walk and use the crutches, supervising and ensuring that proper fall prevention precautions were in place, as well as in the observation of the individual using the crutches, which includes staying in close proximity to the patient to prevent a fall."

In the motion to dismiss, Pettway argued that the report was deficient because (1) Xeller is not qualified to opine on the standard of care and breach applicable to an emergency medicine physician; (2) Xeller does not provide the standard of care applicable to an emergency medicine physician; and (3) Xeller's opinion on causation is conclusory.

The trial court denied the motion, and Pettway brings this interlocutory appeal. *See* Tex. Civ. Prac. & Rem. Code § 51.014(a)(9).

## II. ANALYSIS

In two issues, Pettway contends that the trial court abused its discretion by denying the motion to dismiss. In his first issue, Pettway contends that the expert report fails to provide a sufficient opinion on the applicable standard of care and breach of that standard for two reasons: (1) Xeller is not qualified to provide an opinion on standard of care; and (2) Xeller fails to establish an appropriate standard of care with any specificity. In his second issue, Pettway contends that the report fails to link the damages sustained by Olvera to any specific breach of an applicable standard of care.

## A. General Principles and Standard of Review

In a health care liability claim, a claimant must serve an expert report on each defendant. *See id.* § 74.351(a). An expert report is defined as:

4

> . . . a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed.

*Id.* § 74.351(r)(6).

When, as here, a defendant challenges the adequacy of the expert report, the trial court must grant the motion "only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report." *Id.* § 74.351(l); *Baty v. Futrell*, 543 S.W.3d 689, 693 (Tex. 2018). An expert report satisfies this "good-faith effort" requirement if the report discusses the standard of care, breach, and causation with sufficient specificity to (1) inform the defendant of the specific conduct called into question and (2) provide a basis for the trial court to conclude that the claims have merit. *See Baty*, 543 S.W.3d at 693–94; *Jelinek v. Casas*, 328 S.W.3d 526, 539 (Tex. 2010). Although a report need not marshal the plaintiff's proof, it must provide more than conclusory statements concerning the applicable standard of care, breach, and causation. *See Baty*, 543 S.W.3d at 693; *Jelinek*, 328 S.W.3d at 539, 540 n.9. Regarding causation, a report must explain "how and why the breach caused the injury based on the facts presented." *Jelinek*, 328 S.W.3d at 540.

A person who gives an opinion regarding whether a physician departed from accepted standards of medical care, as in this case, is considered an expert only if the person is qualified to testify as an expert. *See* Tex. Civ. Prac. & Rem. Code § 74.351(r)(5)(A). Thus, a report may be deficient if the person who provided the report is not qualified. *See Henry v. Kelly*, 375 S.W.3d 531, 536 (Tex. App.— Houston [14th Dist.] 2012, pet. denied). For purposes of this case, a person may qualify to testify as an expert if the person is a physician who:

(1) is practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose;

(2) has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

(3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care.

Tex. Civ. Prac. & Rem. Code § 74.401(a); *see also Bailey v. Amaya Clinic, Inc.*, 402 S.W.3d 355, 362 (Tex. App.—Houston [14th Dist.] 2013, no pet.). To be qualified, the expert must have knowledge, skill, experience, training, or education regarding the specific issue before the court. *Bailey*, 402 S.W.3d at 363.

To determine the adequacy of an expert report, courts look only to the four corners of the report. *Jelinek*, 328 S.W.3d at 539. Similarly, to determine if a person is qualified as an expert, courts look only to the report and curriculum vitae. *Mem'l Hermann Healthcare Sys. v. Burrell*, 230 S.W.3d 755, 758 (Tex. App.—Houston [14th Dist.] 2007, no pet.).

The purpose of the expert-report requirement is to deter frivolous claims, not to dispose of claims regardless of their merit. *Scoresby v. Santillan*, 346 S.W.3d 546, 554 (Tex. 2011). Accordingly, the Texas Supreme Court "has encouraged trial courts to liberally construe expert reports in favor of plaintiffs." *Henry*, 375 S.W.3d at 535; *see also Loaisiga v. Cerda*, 379 S.W.3d 248, 264 (Tex. 2012) (Hecht, J., concurring and dissenting) ("An expert report, as we have interpreted it, is a low threshold a person claiming against a health care provider must cross merely to show that his claim is not frivolous.").

We review a trial court's denial of a motion to dismiss under Section 74.351 for an abuse of discretion. *Bailey*, 402 S.W.3d at 361; *see also Baty*, 543 S.W.3d at 693. A trial court abuses it discretion if it acts in an unreasonable or arbitrary manner

6

or without reference to any guiding rules or principles. *Bailey*, 402 S.W.3d at 361. We do not substitute our judgment for the trial court's. *Henry*, 375 S.W.3d at 535.

## B. Qualifications

In his first issue, Pettway contends Xeller is not qualified to provide an opinion on the standard of care applicable to Pettway. The crux of Pettway's argument is that Xeller is not qualified to provide an opinion "as to an emergency medicine physician" because Xeller does not have knowledge, training, or experience specifically related to emergency medicine.

A physician serving as an expert need not be a specialist in the particular branch of the profession for which the testimony is offered. *Blan v. Ali*, 7 S.W.3d 741, 745 (Tex. App.—Houston [14th Dist.] 1999, no pet.). The plaintiff must present an expert "with knowledge of the specific issue which would qualify him or her to give an opinion on that subject." *Id.* (citing *Broders v. Heise*, 924 S.W.2d 148, 152 (Tex. 1996)). The plain language of the statute focuses not on the doctor's area of expertise, but on the condition involved in the claim. *Id.* at 746; *see* Tex. Civ. Prac. & Rem. Code § 74.401(a)(2).

For example, in *Blan* this court held that a neurologist could testify about standards of care applicable to a cardiologist and an emergency medicine physician because the neurologist's testimony was about matters clearly within his knowledge and not about matters that were peculiar to the fields of cardiology or emergency medicine. *See* 7 S.W.3d at 746–47. In *Bailey*, this court held that an orthopedic surgeon was "eminently qualified" to opine about the standard of care applicable to a dermatologist who was treating the claimant for weight loss with liposuction. *See* 402 S.W.3d at 359, 363–64. The plaintiff's claim in *Bailey* was based on the allegation that she, a person with ambulation problems, injured her ankles because the doctor directed her to use an exercise machine after a weight-loss procedure. *Id.*

at 364. Specifically, the plaintiff slipped from the platform of the exercise machine and fell. *See id.* at 369–70. The expert stated in his report that he worked with patients using exercise equipment and supervises health care professionals who do the same. *Id.* at 364. This court held that the expert did not need to show expertise in the field of dermatology or in the treatment of patients for weight loss, or expertise regarding the particular exercise machine involved in the case. *See id.* at 363.

In this case, Olvera allegedly fell while using crutches because Pettway did not instruct her about how to use the crutches and did not supervise her training with the crutches. Thus, the condition involved in this case is a patient's fall while using crutches after inadequate instruction and supervision. Xeller states in his report that he orders crutches for patients with injuries similar to Olvera's and trains them on the proper use in a safe environment. He identifies his specific training for instructing patients on the proper manner and way in which to walk and use crutches, supervising and ensuring that proper fall prevention precautions were in place, and observing patients with crutches, which included staying in close proximity to patients to prevent falls.

Pettway frames the specific issue in this case too narrowly by contending that Xeller must be qualified in emergency medicine. *See id.* Rather, Xeller's report demonstrates his knowledge, skill, experience, and training regarding the specific issue before the court—the standard of care owed to a patient who is using crutches. The trial court acted within its discretion to conclude that Xeller is qualified. *See id.*

## C. Standard of Care and Breach

Also within his first issue, Pettway contends that Xeller's report does not provide the applicable standard of care nor explain what Pettway did to breach that standard. Similar to Pettway's attack on Xeller's qualifications, Pettway complains: "While the report attempts to explain what the standard of care would be as to the

8

use of crutches, it never explains how any of that is applicable to an emergency department physician." Pettway interprets the report to require a physician to "maintain a 24 hour vigil over all patients in the emergency department" and indicates that the proposed standard is impractical and impossible. Pettway refers to Xeller's proposed standard as speculative and conclusory.

Pettway's attack appears to be on the "believability" of the articulated standard of care, but "[a]t this preliminary stage, whether those standards appear reasonable is not relevant to the analysis of whether the expert's opinion constitutes a good-faith effort." *Miller v. JSC Lake Highlands Operations, LP*, 536 S.W.3d 510, 516–17 (Tex. 2017). Rather, we look at the report to determine if it contains specific information about what, in the expert's opinion, the applicable standard of care required Pettway to do differently. *See id.*

As recited in greater detail above, Xeller provides specific information about what the applicable standard of care required Pettway to do: "Specifically, the standard of care is for the doctor to tell the patient what the crutches are for, explain to the patient the proper positioning of the body when standing straight and holding the crutches, how to hold the crutches, how to walk, sit, and move around with the crutches, where to put the crutches, and to explain the importance of walking safely to avoid additional injuries." Xeller opines that Pettway was required to supervise and help Olvera use the crutches. And, Xeller states that Pettway breached these standards, among others, by failing to instruct Olvera in the use of crutches and failing to supervise her training on the use of crutches. Xeller's report provides many more details than a bare assertion that Pettway did not use precautions to prevent a fall. *Cf. Am. Transitional Care Ctrs. Of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 880 (Tex. 2001) (holding that the statement in the report—"that precautions to prevent [the patient's] fall were not properly used"—was conclusory as to the standard of

care because the defendant could not determine from the report whether the defendant was required to monitor the patient more closely, restrain the patient more securely, or do something else entirely).

The trial court did not abuse its discretion by concluding that Xeller's report satisfied the "good-faith effort" requirement because the report informs Pettway of the specific conduct called into question. *See Baty*, 543 S.W.3d at 693–94; *Miller*, 536 S.W.3d at 516–17; *see also Bailey*, 402 S.W.3d at 368 (holding that the expert reports adequately articulated relevant standards of care despite the defendant–dermatologist's claim that the articulated standards of care were not equally applicable among practice areas; surgeon–experts opined that the dermatologist should not have ordered or allowed the patient to use an exercise machine).

Pettway's first issue is overruled.

## D.    Causation

In his second issue, Pettway contends that Xeller's report is deficient because it fails to "adequately describe the causal connection between the alleged breaches of the standard of care to the harm allegedly suffered by the Appellee." Specifically, Pettway claims "there is no clear explanation of how we get from patient education to injury," and there is "absolutely no explanation as to how the fall actually caused the downstream injuries." Pettway also faults Xeller's report for failing to exclude other possible causes.

Pettway contends that the Texas Supreme Court's decision in *Columbia Valley Healthcare System, L.P. v. Zamarripa* is analogous. *See* 526 S.W.3d 453 (Tex. 2017). In that case, the plaintiff sued a hospital based on the hospital's nurses' failures to prevent a patient from being transferred by ambulance to another location when the patient was not suitable for discharge. *See id.* at 457. The experts' reports

10

acknowledged that it was a doctor, and not the hospital's employees, who ordered the patient's transfer. *Id.* at 461. And, the reports did not explain how the hospital permitted or facilitated the transfer, or even whether the hospital had any say in the matter. *Id.* The experts did not explain how the hospital had the right or means to persuade the doctor to not order the transfer or to stop the transfer. *Id.* Thus, the Texas Supreme Court held that the reports were deficient because they did not adequately show a causal relationship. *See id.* at 460–61.

*Zamarripa* is inapposite. Xeller identifies as part of the standard of care that Pettway had an obligation to ensure that Olvera understood how to use the crutches to prevent a fall. According to Xeller, this obligation included instructing Olvera about how to use the crutches and supervising and helping Olvera ambulate with the crutches. Xeller states that Olvera was left unsupervised and walked with the crutches without knowing how to use them "and as a result suffered a slip and fall and hit her head, twisted her neck and wrenched her shoulder (right) when she fell and landed on the concrete floor." Xeller states that as a result of Pettway's failure to instruct Olvera on how to use the crutches, "Olvera did not know how to use the crutches and fell and hit her head and body on the concrete floor." Xeller also states that the fall caused Olvera's concussion, headaches, neck pain (which allegedly resulted in a recommendation for a cervical spine operation), and shoulder injury (which allegedly resulted in surgery for a ruptured biceps tendon).

Xeller, therefore, links the standard of care (failure to instruct and supervise) with Olvera's lack of knowledge on how to use the crutches and her falling, which resulted in her hitting her head on the concrete floor, twisting her neck, and wrenching her shoulder. *Bailey* is analogous. The experts in that case opined that the patient suffered an ankle fracture after falling from an exercise machine, which the defendant told her to use. *See* 402 S.W.3d at 369–70. A report sufficiently addressed

11

the element of causation by linking the breach of the standard of care (directing the patient to use the machine) with the ankle injury. *See id.* at 370. Xeller does the same by linking Pettway's alleged failure to instruct and supervise Olvera with the fall and resulting injuries. Accordingly, Xeller's report is sufficient to give the trial court discretion to conclude that Olvera's claims have merit. *See id.* at 369–70; *see also Methodist Hosp. v. Shepherd-Sherman*, 296 S.W.3d 193, 199–200 (Tex. App.— Houston [14th Dist.] 2009, no pet.) (no abuse of discretion to deny motion to dismiss when the standard of care was for the hospital to contact the patient's doctor as the patient requested, and the failure to contact the doctor resulted in injuries from a procedure that "no reasonable doctor" would have performed; holding that the report did not need to be based on specific evidence of what the uncalled doctor would have done).

Finally, Xeller was not required to exclude other possible causes for Olvera's fall. *See Bailey*, 402 S.W.3d at 369 ("Nothing in section 74.351 suggests the preliminary report is required to rule out every possible cause of the injury, harm, or damages claimed, especially given that section 74.351(s) limits discovery before a medical expert's report is filed."). Even if further litigation might show that Pettway is not liable because Xeller's causation opinion is wrong, the only question presented at this stage in the case is whether the report provides enough information for the trial court to conclude that the report was a good-faith effort. *See Miller*, 536 S.W.3d at 517; *see also Shepherd-Sherman*, 296 S.W.3d at 200. We conclude that the report contained sufficient information, so the trial court acted within its discretion.

Pettway's second issue is overruled.

## III.   CONCLUSION

In sum, the trial court did not abuse its discretion by concluding that Xeller's report amounted to a good-faith effort to describe the standard of care, breach, and

12

causation with sufficient specificity to (1) inform Pettway of the specific conduct called into question and (2) provide a basis for the trial court to conclude that the claims have merit.

Having overruled both of Pettway's issues, we affirm the trial court's order denying the motion to dismiss.


/s/    Ken Wise
        Justice


Panel consists of Chief Justice Frost and Justices Busby and Wise.