

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

No. 07-24-00363-CV

COLVIN PAIN MANAGEMENT, PLLC, INTERVENTIONAL PAIN AND
REGENERATIVE MEDICINE, AND JEFFREY N. COLVIN, M.D., APPELLANTS

V.

ANGELA D. TYLER, APPELLEE

On Appeal from the 99th District Court
Lubbock County, Texas
Trial Court No. DC-2024-CV-0311, Honorable J. Phillip Hays, Presiding

April 10, 2025

## MEMORANDUM OPINION

Before QUINN, C.J., and DOSS and YARBROUGH, JJ.

The question before us is whether an expert is needed to explain that a physician rubbing a patient's vagina and attempting to solicit oral sex for the purpose of satiating that doctor's sexual urge deviates from medical standards of care when the patient sues. Jeffrey N. Colvin, M.D., argues that Angela D. Tyler's ensuing suit arising from those assaults is a health care liability claim mandating an expert report so explaining. Tyler argues otherwise. The trial court sided with Tyler. We affirm.

***Background***

Colvin Pain Management, PLLC (CPM) and Dr. Jeffrey N. Colvin (collectively referred to as Colvin) appeal from the trial court's denial of their motion to dismiss with prejudice and award of legal fees and costs. As indicated earlier, the underlying suit arose from Colvin's sexual assault upon and effort to engage in oral sex with Angela D. Tyler, an employee at the time. It occurred while purporting to consensually examine Tyler's body for purposes of a fat transfer procedure. He later admitted to investigating officers that he touched Tyler's vaginal area with intent to "initiate oral sex" and asked Tyler if he could perform oral sex on her. Tyler described the act as Colvin "rubbing my vaginal opening," "asking if it felt good," and asking, "should he use his tongue." Colvin also acknowledged at the evidentiary hearing conducted by the trial court that "examination of her vagina would be outside of the medical examination that [he was] giving her."

Tyler sued because she did not consent to the sexual overture. Her causes of action sounded in assault, infliction of emotional distress, and constructive discharge from employment. Colvin joined issue, deemed the causes of action to be health care liability claims, and moved for their dismissal after Tyler failed to timely file an expert's report. The trial court denied that motion. The two issues before us are interrelated. Both concern whether the causes of action fell under the umbrella of health care liability claims thereby obligating Tyler to file an expert report per § 74.351(a) of the Texas Civil Practice and Remedies Code.

2

### Preliminary Issue

We address a preliminary matter before considering the substance of the two issues. Tyler asks that we take judicial notice of a judgment memorializing Colvin's later criminal conviction for "Indecent Assault" committed upon her. The Lubbock County Court at Law Number One purportedly signed the decree on January 13, 2025. Tyler attached the item as an exhibit to her appellee's brief. Because it was neither part of the record before the trial court when denying the motion to dismiss nor otherwise included within the appellate record via some other permissible means, it lies beyond our purview. *Ramex Constr. Co. v. Tamcon Servs., Inc.*, 29 S.W.3d 135, 139 (Tex. App.—Houston [14th Dist. 2000, no pet.) (appellate court may not consider exhibits attached to briefs that are not part of the appellate record). Thus, we deny the request to take judicial notice of Colvin's purported criminal conviction.

### Issues One and Two

Underlying each of Colvin's two issues is the complaint that the trial court erred in in concluding that the lawsuit did not involve a health care liability claim and, consequently, there was no need for an expert report. He contends that "[e]ven an assault claim can be a [health care liability claim] if it meets the statutory definition of" one, and it "is irrelevant that Tyler framed her claims as intentional torts." In his view, "her claims are a [health care liability claim] because they are against a physician and his medical practice for treatment or other departure from the standard of care that proximately caused her injuries." We overrule the issues.

Statute provides that: "[i]n a health care liability claim, a claimant shall, not later than the 120th day after the date each defendant's original answer is filed or a later date

3

required under Section 74.353, serve on that party or the party's attorney one or more expert reports, with a curriculum vitae of each expert listed in the report for each physician or health care provider against whom a liability claim is asserted." TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a). The failure to do so results in dismissal of the suit, with prejudice, coupled with an award of attorney's fees and court costs. *Id.* at § 74.351(b)(1) & (2). No one questions that the trial court's refusal to dismiss under the latter provision is subject to interlocutory review. *See Fuller v. Milton*, No. 07-23-00204-CV, 2023 Tex. App. LEXIS 9284, at *4 (Tex. App.—Amarillo Dec. 11, 2023, no pet.) (mem. op.) (citing TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(9); *Scoresby v. Santillan*, 346 S.W.3d 546, 549 (Tex. 2011)). Furthermore, the applicable standard of review when assessing the accuracy of that decision is one of abused discretion. *Id.* (citing *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 878 (Tex. 2001)). Such discretion is abused when the court acts in an arbitrary or unreasonable manner or without reference to any guiding rules or principles. *Id.*

> Next, the legislature defined a health care liability claim as:

> a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care, which proximately results in injury to or death of a claimant, whether the claimant's claim or cause of action sounds in tort or contract.

TEX. CIV. PRAC. & REM. CODE ANN. § 74.001(a)(13). Such a claim has three elements: 1) the defendant is a health care provider or physician; 2) the claimant's cause of action is for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, health care, or safety or professional or administrative services directly related to health care; and 3) the defendant's alleged departure from accepted standards

4

proximately caused the claimant's injury or death. *Loaisiga v. Cerda*, 379 S.W.3d 248, 255 (Tex. 2012). According to our Supreme Court, the "breadth of the statute's text essentially creates a presumption that a claim is [a health care liability claim] if it is against a physician or health care provider and is based on facts implicating the defendant's conduct during the course of a patient's care, treatment, or confinement." *Id.* at 256. Yet, it also told us that assault is not such a claim if the record conclusively shows that: 1) there is no complaint about any act of the provider related to medical or health care services other than the alleged offensive contact, 2) the alleged offensive contact was not pursuant to actual or implied consent by the plaintiff, and 3) the only possible relationship between the alleged offensive contact and the rendition of medical services or healthcare was the setting in which the act took place. *Id.* at 257. And, in conducting our analysis, "we consider the entire record before the trial court and the overall context of the [plaintiff's] suit, including the nature of the factual allegations in their pleadings, [the defendant's] contentions, and the motions to dismiss and responses." *Id.*

As for Tyler's pleadings, they describe acts occurring within a physician's office at the end of "an exam for fat transfer." That Tyler submitted and consented to the examination of her breasts, abdomen, and thighs to determine the presence of sufficient bodily fat to effectuate the transfer is apparent from her live pleading. Her hesitance arose when Colvin "asked her to pull down her panties so he could examine and check for laxity of the vaginal area." Though questioning the necessity for that, she nonetheless complied. That led to Colvin "pressing on her vagina" and concluding "[t]here is no problem with your vagina." Upon making that determination, he then "began rubbing in her vaginal opening," "asked if it felt good," "asked what he could do to make it feel better"

5

when she said "no," heard Tyler utter "stop," and replied with "[w]hat if I use my tongue." That resulted in Tyler's dressing and leaving the room. Admittedly, the verbiage used in describing her causes of action do not expressly limit her complaint to acts arising after Colvin initially pressed on her vagina and found "no problem" with it. A reasonable reading of same could lead one to believe that Colvin's initial contact with her vagina when purportedly checking for "laxity" falls within the ambit of her sexual assault and bodily injury claims. Yet, even at that point, Tyler expressed hesitance. Furthermore, nothing in the pleading alludes to a purported deviation from standards of care applicable to health care providers after Colvin concluded there was "no problem" with Tyler's vagina, decided to continue rubbing it, and queried about pleasing her sexually with his tongue.

Colvin did generally deny Tyler's allegations via his answer. He also premised his motion to dismiss on 1) consent and 2) the nominal time lapse between the initial examination of Tyler's vagina for "laxity," declaring it to be without problem, and deciding to "initiate oral sex." Again, that he so decided to initiate sex was a matter he admitted to police. That examining Tyler's vagina was "outside of the medical examination [i.e., fat transfer examination] that you were giving her" was also a matter to which he admitted to the trial court. The same is true of endeavoring to engage in oral sex; it too was outside the scope of the examination being conducted, according to Colvin. So, Colvin's own words illustrate that examining Tyler's vagina was not a component of the medical procedure he was conducting upon her when he decided to rub the body part and initiate oral sex. And, though Tyler may have consented to undergoing bodily examination to facilitate the assessment of her susceptibility to a fat transfer procedure, nothing before

6

the trial court indicated she acquiesced to subsequent vaginal manipulation once Colvin declared that body part to be free of problem. He pursued such manipulation post-declaration while intending to "initiate oral sex" and despite Tyler's spurning his efforts.

An allegation of assault against a physician is not a health care liability claim if the conduct of which a plaintiff complains is "wholly and conclusively inconsistent with, and thus separable from," receiving healthcare. *Loaisiga*, 379 S.W.3d at 257. That encompasses the circumstances here given Colvin's concessions about 1) his intention to initiate oral sex and 2) the vaginal examination and oral sex being outside the scope of the fat transfer assessment in which he engaged. He may have been conducting a consensual exam attendant to a potential fat transfer procedure. His intent avowedly changed from conducting a medical examination to the pursuit of sexual activity. Nothing of record suggests that digitally manipulating her vagina to arouse Tyler then offer to perform cunnilingus to further that goal was part of the fat transfer examination. Nothing of record suggests Tyler consented to his attempt to engage in sexual activity. Nothing of record suggests that in complaining of those acts, Tyler complains of some deviation from applicable medical standards of care. Indeed, the trial court had reasonable evidentiary basis to conclude that the only relationship between the sexual assault and medical care was the setting, for Colvin had stopped any semblance of treatment to pursue his personal sexual whims.

Arguably, an alleged assault that transpired during a medical procedure may implicate a health care liability claim. *See, e.g., Vanderwerff v. Beathard*, 239 S.W.3d 406, 409 (Tex. App.—Dallas 2007, no pet.) (so finding). But, not every sexual assault upon a patient by a physician within a health care facility does. Opinions from sister

7

appellate courts prove as much. For example, in *Jaffer v. Maestas*, No. 01-23-00541-CV, 2024 Tex. App. LEXIS 2079 (Tex. App.—Houston [1st Dist.] Mar. 26, 2024, no pet.) (mem. op.), the plaintiff awoke after a breast augmentation procedure to find Jaffer pressing his penis to the plaintiff's foot and rubbing her vagina. *Id.* at 2024 Tex. App. LEXIS 2079 at *1. The court found that Maestas did not "complain about the procedure she had performed at Azul, only the alleged offensive touching as she came out of the procedure." *Id.* at *7-8. And, though she consented to the augmentation procedure, nothing in that record suggested she did so to the actions involving her foot and vagina. *Id.* The only possible relationship between the alleged sexual assault and medical procedure consisted of their occurrence in a medical facility by a physician. *Id.* Thus, the trial court did not err in refusing to dismiss the suit when Maestas failed to provide an expert report. *Id.* at 11.

In *Gill v. Goodson*, No. 10-23-00249-CV, 2024 Tex. App. LEXIS 5075 (Tex. App.—Waco July 18, 2024, pet. denied) (mem. op.), Goodson sought medical care from Gill to address back and pain issues. *Id.* at *1-2. Under the auspices of providing that care, Gill directed her to unbutton her jeans, slid his hand between her buttocks, and began digitally penetrating her anus. *Id.* at *2. During a later examination, Gill slid his hand into Goodson's underwear and digitally penetrated her vagina, resulting in her directive to stop. *Id.* at *2-3. Her ensuing causes of action against Gill for sexual assault, intentional infliction of emotional distress, harassment, and physical injury founded upon the aforementioned conduct were not health care liability claims, according to the reviewing court. *Id.* at *6. "Goodson [did] not complain about any medical or health care procedure or service by Gill except for the alleged sexual assaults occurring during two

appointments." *Id.* at *5. Nothing suggested she "consented to Gill's assaults, and the setting was the only relationship between those assaults and the provision of medical or health care. *Id.* As the court noted, "'it would defy logic to suggest that [this] sexual assault[] is an inseparable part of the rendition of medical care or a departure from accepted standards of health care.'" *Id.* at *6 (quoting *Jaffer, supra*).

Most similar to the circumstances before us are those in *Wasserman v. Gugel*, No. 14-09-00450-CV, 2010 Tex. App. LEXIS 3749 (Tex. App.—Houston [14th Dist.] May 20, 2010, pet. denied) (mem. op.). There, under the pretense of examining Gugel's complaint about back pain, Wasserman pulled down Gugel's sweatpants, touched her vulva, spread her buttocks after she rolled over, inserted his finger into her vagina, and asked if she had feeling in her vaginal area. *Id.* at *4. Gugel quickly left Wasserman's office thereafter. *Id.* Gugel's causes of action for sexual assault and battery, intentional infliction of emotional distress, and harassment founded upon those acts also were held not to be health care liability claims. *Id.* at *10. The *Wasserman* panel observed that "[t]his is not a case where the defendant doctor's alleged conduct could be explained as a necessary part of his treatment of the plaintiff's pain in her upper thigh or a slip of the hand during that treatment." *Id.* at *10. "Under no reasonable view of the allegations . . . could it be argued that a surgical consult for back surgery would require Wasserman, an orthopedic surgeon, to insert his finger into Gugel's vagina and ask if had she feelings in that location." *Id.*

In comparison, the chiropractor in *Vanderwerff* was tasked with investigating the source of pain in Beathard's neck, wrists, and left knee. *Vanderwerff*, 239 S.W.3d at 409. In response to his inquiry, Beathard placed an X on a drawing to demarcate the areas of

9

pain. *Id.* One X appeared in the upper thigh area. Apparently while examining her knee, the chiropractor touched her genitals. He contended that the procedure being pursued included manipulation "from the area around a patient's knee for diagnostic and treatment purposes," and several "of these muscles . . . stretch from the knee to the pelvis." *Id.* Given this, according to the court, the "threshold questions" included whether his examination was within the scope of a chiropractic examination. *Id.* It continued by saying that the question "cannot be answered without reference to the standard of care required of a chiropratic provider." *Id.* So, "[a]s a result, Beathard's claim was a health care liability claim subject to the expert report requirements . . . ." *Id.*

It takes little to see that the circumstances at bar liken not to those in *Vanderwerff*. To reiterate, Colvin uttered words which can be reasonably interpreted as acknowledging his perusal and manipulation of Tyler's vagina to instigate sex was not part of the overall fat transfer examination. Vanderwerff made no such admissions when touching his patient's genitalia.[1]

Our circumstances liken to those in *Wasserman*, *Gill*, and *Jaffer.* We, like the *Jaffer* court, believe "[i]t does not require professional medical judgment to conclude that allegations of sexual assault . . . fall outside acceptable safety or medical standards" when the acts occur once the procedure ends. *Jaffer*, 2024 Tex. App. LEXIS 2079, at *9-10. And, Colvin himself provided the evidence indicating the fat transfer examination ended when he decided to rub Tyler's vagina with the intent to engage in oral sex.[2] Furthermore,

---

[1] It could also be said that even if a medical report were needed to explain that rubbing the vagina and soliciting sex was not part of the standard of care applicable to this fat transfer procedure, Colvin himself provided it. One cannot reasonably ignore his admissions to the court and investigating officer.

[2] See footnote one.

she objected and left, as did the patient in *Wasserman* after experiencing her physician touch her vulva, insert his finger in her vagina, and inquire if she felt anything while purportedly examining her back for pain. Additionally, the touchings in *Gill* and *Wasserman* apparently transpired during the procedure being conducted. That those courts, nonetheless, found that the circumstances did not render the ensuing suits health care liability claims is informative. They negate Colvin's suggestion that the mere passage of a few seconds between a legitimate examination and the pursuit of personal sexual interests renders an assault a health care liability claim.

Simply put, our analysis of the circumstances within the framework of the law leads us to conclude that the trial court did not abuse its discretion in denying Colvin's motion to dismiss. Tyler was not and does not pursue a health care liability claim. Thus, she had no need to proffer Colvin an expert report explaining that rubbing her vagina and soliciting oral sex for the purpose of satiating his sexual urge deviated from acceptable medical standards of care when assessing the viability of the particular fat transfer procedure here.

We overrule Colvin's issues and affirm the trial court's order refusing to dismiss Tyler's suit.


Brian Quinn
Chief Justice